**Albert CASSENS and Doris Cassens, Plaintiffs,**

v.

**ST. LOUIS RIVER CRUISE LINES, INCORPORATED, et al., Defendants–Third/Party Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Third/Party Defendant–Appellee.**

No. 94–1832.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 7, 1994.

Decided Jan. 4, 1995.

Joel K. Goldstein, Douglas E. Gossow, Gary T. Sacks (argued), Goldstein & Price, St. Louis, MO, for defendants-appellants St. Louis River Cruise Lines, Inc., individually and as general partner of Connelly Group—Missouri, a general partnership dba Gateway Riverboat Cruises, Cruise Lines, Inc., as successor in interest to St. Louis River Cruise Lines, Inc.

Robert L. Simpkins, Asst. U.S. Atty., Office of U.S. Atty., Crim. Div., Fairview Heights, IL, David V. Hutchinson, Keith B. LeTourneau (argued), Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendant-appellee U.S.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

Albert Cassens fell on the stairs between the Texas and Hurricane decks of the *Belle of St. Louis* ("the Belle"), a Mississippi River excursion cruise boat. The stairs had no handrails. The Belle's owner-operator, St. Louis River Cruise Lines, Inc. ("SLRCLI"),[1] filed a third-party complaint against the United States based on the Coast Guard's certification of the Belle as "fit for the service intended of carrying passengers and in compliance with applicable regulations," despite the absence of handrails. The issue in this case is whether the United States is amenable to this suit under the Suits in Admiralty Act or whether the district court correctly dismissed the suit for want of jurisdiction under the discretionary function exception to the United States' waiver of sovereign immunity.

1. SLRCLI has merged into Cruise Lines, Inc., which as SLRCLI's successor in interest is also a defendant and third-party plaintiff.

2. There would appear to be a threshold question whether this suit falls within the SAA's waiver of sovereign immunity. Because the Government is only liable to the same extent as a private person, SLRCLI can only fit its claim for contribution

## Background

### The Suit

Plaintiff Albert Cassens, a passenger on the Belle, is suing SLRCLI and others for injuries he suffered as a result of a fall on one of the Belle's stairways. He alleges in his second amended complaint that among other negligent acts and omissions, defendants negligently failed to equip the stairway with handrails.

Defendant SLRCLI, the operator of the Belle, filed a third-party complaint against the United States under the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 742, seeking indemnification or contribution should SLRCLI be found liable to the Cassens. The complaint alleges that the United States Coast Guard is required to inspect passenger vessels, "to make certain that the vessel and its equipment is in satisfactory condition and fit for the service for which it is intended and in compliance with applicable regulations." The complaint further alleges that the Coast Guard had inspected the Belle on numerous occasions before Mr. Cassens' alleged fall and had certified the vessel despite the absence of handrails on the stairwell in question.

### The Suits in Admiralty Act ("SAA") and the Discretionary Function Exception

The SAA is a partial waiver of the United States' sovereign immunity. It states in relevant part:

In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding may be brought against the United States.[2]

46 U.S.C. § 742.

under the SAA if the Coast Guard is liable to the Cassens for a recognized private tort. This presents a question of federal common law. Federal courts sitting in admiralty have applied the "negligent good samaritan rule" of §§ 323 and 324A of the Restatement of Torts to claims of negligent government inspection of vessels. See, e.g., *Patentas v. United States*, 687 F.2d 707 (3rd Cir. 1982). If the Cassens have a claim against the

▆ The discretionary function exception is an exception to the waiver of sovereign immunity granted in the Federal Tort Claims Act, 28 U.S.C. § 2680. Though not a part of the SAA, the discretionary function exception is impliedly contained in that waiver of sovereign immunity as well. *Bearce v. United States,* 614 F.2d 556, 560 (7th Cir.1980), certiorari denied, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44. Under the discretionary function exception, the United States retains its sovereign immunity against

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). In fashioning the discretionary function exception, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1983). "[W]hatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* at 813–14, 104 S.Ct. at 2764.

### Coast Guard Inspections

The Coast Guard administers a marine vessel inspection program for passenger vessels. The program includes an initial inspection and certification process which is renewed annually. 46 U.S.C. § 3305, "Scope and Standards of Inspection," provides in part:

> (a) The inspection process shall ensure that a vessel subject to inspection ...
>
> . . . . .
>
> (5) Complies with applicable marine safety laws and regulations.

46 C.F.R. § 71.25–10 sets the scope for the annual inspections:

> (a) The annual inspection shall include an inspection of the structure, boilers, and other pressure vessels, machinery and equipment. The inspection shall be such as to insure that the vessel, as regards the structure, boilers and other pressure vessels, and their appurtenances, piping, main and auxiliary machinery, electrical installations, life-saving appliances, fire-detecting

---

Coast Guard it would be under § 324A of the Restatement which reads in relevant part:

§ 324A. Liability to Third Person for Negligent Performance of Undertaking
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

. . . . .

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The accompanying comment states that liability will exist "where the reliance of the other, or the third person, has induced him to forgo other remedies or precautions against such a risk." Thus for SLRCLI to fit its claim under the SAA, there must have been justified detrimental reliance on the Coast Guard's inspection and certification that proximately caused Mr. Cassens' injuries.

It seems quite unlikely that Mr. Cassens saw, much less relied on, the Coast Guard certification when he boarded the Belle or used its stairways. Any detrimental reliance, then, must have been on the part of SLRCLI. The claim would have to be that the existence of the Coast Guard inspection process induced SLRCLI to forgo its own safety inspection. This claim of reliance is a far cry from that of the navigators on the lighthouse in *Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and it is difficult to see how such reliance would be either justified or legal. 46 U.S.C. § 3313 places an affirmative duty on the master or owner of a vessel to maintain it "in a condition so as to always be in compliance with the applicable laws and regulations" (legislative history cited in Government's brief at 14 n. 2). Moreover, SLRCLI, which operated the Belle, was in a far better position to know the condition of the vessel and any unreasonable dangers, like stairways without handrails, than a Coast Guard inspector who was only aboard the boat for a few hours. In this circumstance SLRCLI's claimed reliance—and thus resort to the SAA—would appear to be unjustified as a matter of law.

However, the applicability of the SAA to SLRCLI's claims was neither briefed nor argued by the parties, who focused solely on the applicability of the discretionary function exception. Because we find that the district court correctly dismissed the case for want of jurisdiction under the discretionary function exception, we need not address this alternative basis for finding a lack of jurisdiction.

and extinguishing equipment, pilot boarding equipment, and *other equipment is in satisfactory condition and fit for the service for which it is intended, and that it complies with applicable regulations for such vessels,* and determine that the vessel is in possession of a valid certificate issued by the Federal Communications Commission, if required. The lights, means of making sound signals, and distress signals carried by the vessel shall also be subject to the above-mentioned inspection for the purpose of ensuring that they comply with the requirements of the applicable statutes and regulations.

46 C.F.R. § 71.25–10 (emphasis added). Finally, 46 C.F.R. § 72.05–20(k) provides in pertinent part: "For all types of stairways hand rails shall be fitted on both sides of the stairs."

### Analysis

■ Two requirements must be met for the discretionary function exception to apply. The challenged act must (1) "involv[e] an element of judgment or choice" and (2) be "based on considerations of public policy." *United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335. The first requirement will ordinarily not be met when "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531.

■ SLRCLI argues that under *Berkovitz,* the most recent Supreme Court case to limit the scope of the discretionary function exception with respect to regulatory activities, the Coast Guard's inspection program falls outside the exception. SLRCLI contends that the statutory and regulatory language cited above, which dictates that the Coast Guard "shall ensure [compliance]" and also requires handrails, establishes a "course of action" for Coast Guard inspectors such that judgment is not a factor and the discretionary function exception does not apply.

Although it provides useful guidance, *Berkovitz* does not dictate the result here. That suit, brought on behalf of a 2–month–old infant who was left almost completely paralyzed after taking an oral polio vaccine, alleged that the Division of Biological Standards ("DBS"), then a part of the National Institutes of Health, and the Food and Drug Administration ("FDA") acted wrongfully in approving for release to the public the particular lot of vaccines containing the Berkovitz child's dose. The plaintiff in *Berkovitz* made two claims. The first was that the DBS issued a product license for the vaccine without first obtaining test data from the manufacturer. This claim was not barred by the discretionary function exception because the DBS had "no discretion to issue a license without first receiving the required data; to do so would violate a specific statutory and regulatory directive." *Id.* at 542–43, 108 S.Ct. at 1962. SLRCLI does not argue under this prong of *Berkovitz*—whatever the alleged shortcomings of the Coast Guard's inspection, no one disputes that inspectors at least boarded the boat and did some inspecting before the certificate was issued.

The second claim in *Berkovitz,* on which SLRCLI more aptly relies, was that the DBS licensed the vaccine even though it did not comply with certain regulatory safety standards. The Supreme Court pointed out that there were three ways in which this claim could be understood: (1) the DBS licensed the vaccine without first determining compliance, (2) the DBS licensed the vaccine knowing that it did not comply, and (3) the DBS made an erroneous determination of compliance. The court held that if (1) or (2) were the proper understanding of plaintiff's claim, then the discretionary function exception would not apply. *Id.* at 544, 108 S.Ct. at 1962–63. If (3) was the proper understanding of the plaintiff's claim, however, then the applicability of the discretionary function exception would turn "on whether the manner and method of determining compliance with the safety standards at issue involve agency judgement of the kind protected by the discretionary function exception." *Id.* at 545, 108 S.Ct. at 1963. The Supreme Court left it to the district court on remand to determine this issue, if the plaintiff chose to press the second claim.

SLRCLI's claim is clearly of the third variety—that the Coast Guard made an erroneous determination of compliance. *Berkovitz,* therefore, does not hold the discretionary function exception inapplicable. It mere-

ly underscores that the appropriate object of inquiry is the nature of the Coast Guard inspection procedure. In this inquiry, the existence of regulatory requirements, however detailed, is of no import if the means of determining compliance—*i.e.*, the inspection procedure itself—involves the type of judgment protected by the discretionary function exception.

*United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660, further supports our understanding that the judgmental nature of the inspection procedure, not the mandatory nature of the regulations being enforced, is what is relevant in determining the applicability of the discretionary function exception. In *Varig* the Supreme Court held that the discretionary function exception protected the Federal Aviation Administration's ("FAA's") decision to implement a "spot check" program to enforce compliance with aircraft safety standards. More importantly for the present case, the Court also held that the discretionary function exception shielded the acts of FAA employees in implementing the "spot check" program:

> In administering the "spot check" program, these FAA engineers and inspectors necessarily took certain calculated risks, but those risks were encountered for the advancement of a governmental purpose and pursuant to the specific grant of authority in the regulations and operating manuals. Under such circumstances, the FAA's alleged negligence in failing to check certain specific items in the course of certificating a particular aircraft falls squarely within the discretionary function exception.

*Id.* at 820, 104 S.Ct. at 2768.

The Eighth Circuit's opinion in *Tracor/MBA, Inc. v. United States*, 933 F.2d 663 (8th Cir.1991), is illustrative of the amount of specificity required before a directive will be read to take the inspector's actions out of the discretionary function exception. *Tracor* involved a fire at a munitions plant following an allegedly negligent inspection. The inspectors in *Tracor* were given checklists to follow when conducting their inspections, but because the checklists did not prescribe a specific mandatory course of action for the inspectors to follow, the Eighth Circuit held that the discretionary function exception applied and barred the suit.

> [A]ll of the points on the checklist upon which Tracor relies merely state a very general course of conduct for inspectors to follow. For example, the checklist tells the inspector to check the ventilation every 30 days. Tracor does not argue that the inspectors failed to check the ventilation. Instead, Tracor contends that the inspectors performed an inadequate inspection of the ventilation. The checklist, however, prescribed no procedures for testing the ventilation and did not specify what action an inspector should take if he found inadequate ventilation to exist.

*Id.* at 667. Similarly here, the regulations at issue are devoid of specific directives.

■ Neither 46 U.S.C. § 3305 nor 46 C.F.R. § 71.25–10 [3] specify a course of conduct for Coast Guard inspectors. 46 U.S.C. § 3305's directive that the "inspection process shall insure" compliance sets the goal for the inspection process but does not set out specific steps for inspectors to follow in conducting their inspection. Moreover, "inspection process" is nowhere defined in the statute, and may include the owner's role in presenting a complying vessel as well as the Coast Guard's role in inspecting it. [4]

46 C.F.R. § 71.25–10 adds little in the way of specific directives as to the steps to be taken by Coast Guard inspectors. The regulation directs the inspector to include certain specified items such as fire equipment and pressure vessels in his inspection, but does not specify steps to be taken in inspecting

---

**3.** For simplicity we discuss only 46 C.F.R. § 71.25–10, which concerns the scope of annual inspections. 46 C.F.R. § 71.20–15, the analogous provision concerning the scope of initial inspections, contains essentially the same relevant language. Hence our analysis of § 71.25–10 carries over to § 71.20–15.

**4.** Support for this view can be found in 46 C.F.R. § 71.25–5, which places the burden on the own-

er or operator to apply in writing for an annual inspection before one may be conducted. 46 U.S.C. §§ 3313 and 3315 place additional duties on the owner or operator: § 3313 states that "[d]uring the term of a vessel's certificate of inspection, the vessel must be in compliance with its conditions." § 3315 requires the master of the vessel to assist in the inspection and to point out deficiencies of which he is aware.

those items. Moreover, the only direction that could arguably apply to the handrails at issue is the reference to "other equipment." [5] The regulation does not specify procedures for the inspector to follow in inspecting the "other equipment."

Finally, it appears that when Coast Guard inspectors are required to follow specific inspection procedures, the regulations carefully specify those procedures. For example, 46 C.F.R. § 71.25–15, which applies to lifesaving equipment, provides in part:

(a) At each annual inspection, the inspector shall conduct the following tests and inspections of lifesaving equipment:

.    .    .    .    .

(2) Each lifeboat shall be lowered to near the water and then be loaded with its allowed capacity, evenly distributed throughout the length and then be lowered into the water until it is afloat and be released from the falls ...

Similarly detailed provisions apply to the inspection of fire equipment, hull equipment, etc. The obvious implication is that where such specific directives are absent, it is within the individual inspector's discretion how to conduct the inspection.

This conclusion makes sense, given the size and complexity of vessels and the limited time and resources available for inspection. Where not specifically directed, an inspector must decide on what components of the vessel and on which of the more than 1000 standards set forth in the regulations (Df.Br. 17 n. 3) to concentrate his efforts and attention. Further evidence that Coast Guard inspectors are expected to make choices and exercise judgment in conducting inspections is found in the Marine Safety Manual section 1.F.2:

Coast Guard Concerns. The Coast Guard's objective is to administer vessel inspection laws and regulations so as to promote safe, well-equipped vessels that

are suitable for their intended service. It is not the Coast Guard's intent to place unnecessary economic and operational burdens upon the marine industry. In determining inspection requirements and procedures, inspection personnel must recognize and give due consideration to the following factors:

a. The burden for proposing acceptable repairs rests upon the vessel's owner, not upon the repair facility or the inspector;

b. Delays to vessels, which can be costly, need to be balanced against the risks imposed by continued operation of the vessel, with safety of life, property, and the environment always the predominant factor over economics;

c. Certain types of construction, equipment, and/or repairs are more economically advantageous to the vessel operator and can provide the same measure of safety;

d. Some repairs can be safely delayed and can be more economically accomplished at a different place and time;

e. The overall safety of a vessel and its operating conditions, such as route, hours of operation, and type of operation, should be considered in determining inspection requirements;

f. Vessels are sometimes subject to operational requirements of organizations other than the Coast Guard; and

g. A balance must be maintained between the requirements of safety and practical operation. Arbitrary decisions or actions that contribute little to the vessel's safety and tend to discourage the construction or operation of vessels must be avoided.

These guidelines evidence the fact that inspectors are required to make choices and exercise judgement in conducting their inspections. These judgments require balancing considerations of safety and economics with reference to the needs and uses of the particular vessel being inspected. Because

---

5. It is not clear whether handrails even constitute "equipment" under the regulation. 46 U.S.C. § 3306 states, among other things, that the Secretary shall prescribe necessary regulations to ensure the proper execution of, and to carry out, this part in most effective manner for—

(1) the design, construction, alteration, repair and operation of those vessels, including superstructures, hulls, fittings, equipment ... If "fittings" and "equipment" are meant to be mutually exclusive categories, since handrails would seem to be fittings, they cannot also be equipment.

they are "based on considerations of public policy," they meet the second requirement for the application of the discretionary function exception. *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1274.

■ SLRCLI next argues that even if Coast Guard inspectors can and do exercise discretion in conducting their inspections, they did not in the present case where they merely failed to notice that the stairway had no handrail. No policy judgment is being challenged, SLRCLI argues—the only claim is that the inspectors negligently failed to look at the stairway and notice that there was no handrail.

SLRCLI correctly points out that this is not a situation in which the Coast Guard inspector exercised his discretion to issue a certificate to a non-complying vessel. Indeed, if that were the Government's claim, it would lose. Both 46 U.S.C. § 3313(b)(1) and § 2.C.2.b. of the Coast Guard Manual specifically require written notification to the owner when an inspector detects non-compliance. Had the inspector noticed the absence of handrails and simply failed to notify SLRCLI, he would have violated this specific directive and would not be shielded by the discretionary function exception.

Nonetheless, SLRCLI wrongly concludes that the discretionary function exception does not apply because the inspector's negligent act, the failure to perceive the absence of handrails, does not involve the exercise of judgment. The protected discretion at issue is the discretion to formulate and conduct a specific inspection procedure for a particular ship. The discretionary function exception shields the entire inspection process including alleged negligent omissions. If the discretionary function exception could be pierced by showing negligent acts in implementing the discretionary function, the exception would be no shield at all. In *Gaubert* the Supreme Court prescribed the proper level at which the conduct should be analyzed:

> The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken

and on whether they are susceptible to policy analysis.

*Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275.

The Eleventh Circuit's opinion in *Autery v. United States,* 992 F.2d 1523 (11th Cir.1993), is illustrative on this point. Autery was killed when a black locust tree fell on his car as he was driving through a national park. The Eleventh Circuit, reversing the district court, found that the discretionary function exception barred the suit:

> The district court's inquiry, on the other hand, by asking whether the park officials had discretion to remove "hazardous" trees, begs the question.... The district court's analysis appears to collapse the question of whether the park service was negligent into the discretionary function inquiry.... [T]he relevant inquiry here is whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner. If not, then the park officials' decision to employ a particular inspection procedure and its execution of that plan is protected by the discretionary function exception.

*Id.* at 1528. Similarly here the question is not whether the Coast Guard had discretion to not notice the missing handrail, but rather whether the inspector was required by statute or regulation to follow a specific course of action when inspecting the ship as a whole. Except for the detailed instructions with respect to lifeboats and the like discussed above, he was not.

This Court reached a similar conclusion in *Hylin v. United States,* 755 F.2d 551 (7th Cir.1985). In *Hylin,* a mine safety inspector failed to cite for correction a defective junction box which later caused the death of the plaintiff's husband. Following *Varig* this Court held that the discretionary function exception barred plaintiff's claim. The Court pointed out that the inspector's specific negligent acts or omissions were not the touchstone of the discretionary function exception analysis. The correct focus was on whether "the regulatory inspection and enforcement activities of an agency require its employees to exercise discretion in performing their

duties." *Id.* at 553. If so, the discretionary function exception bars the suit.

For the foregoing reasons we hold that the discretionary function exception applies and affirm the district court's dismissal of this case for want of subject matter jurisdiction.