James GRAMMATICO, Plaintiff–
Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 96–2954.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1997.

Decided March 19, 1997.

Richard A. Dahl, Barash, Stoerzbach & Henson, Galesburg, IL, Michael J. Warner, Rock Island, IL, for Plaintiff–Appellant.

K. Tate Chambers, Gerard Brost, argued, Office of the U.S. Atty., Peoria, IL, for Defendant–Appellee.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Appellant James Grammatico brings this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Appellant claims that on March 26, 1992, while employed at Lewis Machine and Tool Company, his arm became enmeshed in a radial milling machine, causing severe and permanent injuries to his left hand and forearm. Lewis Machine and Tool Company had purchased the machine at a public auction conducted by the Defense Reutilization and Marketing Service ("DRMS"), a division of the Department of Defense ("DOD") that disposes of the DOD's surplus property.

Grammatico's complaint alleged that the government was strictly liable for placing an inherently dangerous product in commerce, negligent in selling the machine with a defective hand break, without an appropriate guarding mechanism and without an emergency stop mechanism, and negligent in failing to inspect the machine to ascertain whether it was safe when operated for its intended use. The government moved to dismiss the case for lack of subject matter jurisdiction. The district court granted this motion on the ground that the FTCA does not allow for actions based on strict liability and on the ground that appellant's negligence claims were barred by the discretionary function exception to the FTCA. Grammatico appeals only the district court's dismissal of his negligence claims. We affirm.

## I.

The FTCA authorizes suit against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable. . . ." While the FTCA on its face is a "broad waiver" of sovereign immunity that provides for governmental liability commensurate with that of private parties, its waiver of immunity is far from absolute; "several important classes of tort claims" are excepted from the Act's coverage. *See United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). At issue in this case is the "discretionary function exception," which provides that the FTCA shall not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines,* 467 U.S. at 808, 104 S.Ct. at 2762. It was Congress' belief that imposing liability on the government for the discretionary acts of its employees "would seriously handicap efficient government operations." *Id.* at 814, 104 S.Ct. at 2765.

Whether the discretionary function exception bars suit against the United States in a given case depends on two factors. *See Maas v. United States,* 94 F.3d 291, 297 (7th Cir.1996) (citing *Rothrock v. United States,* 62 F.3d 196, 198 (7th Cir.1995)). First, a discretionary act must be involved. In other words, the act for which liability is sought to be imposed must involve "an element of judgment or choice." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (internal quotations omitted); *see also Rothrock,* 62 F.3d at 198. Therefore, if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply.

*Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273. Second, "even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "Because the purpose of this exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy ..., the exception protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323, 111 S.Ct. at 1273–74; *see also Maas,* 94 F.3d at 296; *Rothrock,* 62 F.3d at 198.

■ The district court concluded that the sale of the milling machine by the DRMS was the type of discretionary function excepted from the Act and dismissed the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. We review *de novo* the district court's dismissal of appellant's complaint. *See Rothrock,* 62 F.3d at 198.

## II.

■ In order to determine whether the sale of the milling machine by the DRMS involved an exercise of judgment of the kind that the discretionary function exception was designed to shield, we examine the statutes and regulations which authorized the sale. Under the Federal Property and Administrative Services Act of 1949 ("FPASA"), the Administrator of General Services is entrusted with the broad task of supervising and directing the disposition of surplus property, which includes any excess property not required for the needs of any federal agency. *See* 40 U.S.C. § 484(a) & § 472(g). The Administrator, who is free to delegate this task to any executive agency, has granted the DOD the authority to dispose of its own excess personal property. *See* 41 C.F.R. § 101–45.1031(b). Agencies which have been delegated the task of disposing of their surplus property have the power to "do so by sale, exchange, lease, permit, or transfer, for cash, credit, or other property, with or without warranty, and upon such other terms and conditions as the Administrator deems proper...." 40 U.S.C. § 484(c).

Congress, through these provisions, has vested considerable discretion in the federal agencies, as the means by which the agencies dispose of their surplus property has been left entirely to their judgment. The task of formulating a plan for the disposal of surplus property is one which clearly requires the exercise of judgment and choice as to the proper method and manner of disposal. In the instant case, the DOD has exercised its discretionary authority to dispose of its property by public auction. Nothing in the FPASA or the Federal Property Management Regulations ("the Regulations"), 41 C.F.R. § 101, dictates a procedure for the DOD to follow in selling its property to the public. The DOD, in the absence of regulations guiding its conduct, determined that it would sell the property "as is" and "where is." These terms are outlined in the DOD's "Sale by Reference" pamphlet, which states as follows:

> The Bidder is invited, urged, and cautioned to inspect the property prior to submitting the bid.... Unless otherwise specifically provided in the Invitation, all property is for sale "as is" and "where is." ... [T]he Government makes no warranty, express or implied, as to quantity, kind, character, quality, weight, size, or description of the property, or its fitness for any use or purpose....

In addition, the DOD chose not to inspect its property for defects prior to sale or to issue warnings to purchasers of potential risks associated with its property. This was within the agency's discretion, as nothing in the FPASA or the Regulations require the DOD to assume these responsibilities.[1] The manner in which the sale would be conducted, including the extent to which the agency would take steps to protect the public, was left entirely to the DOD's consideration. *See Cassens v. St. Louis River Cruise Lines,*

---

**1.** Grammatico does argue that the certain provisions of the Regulations and the DRMS Manual, such as those applicable to "hazardous materials," required the DRMS to warn him of the dangers associated with the milling machine. We address this argument in Part III of this opinion.

*Inc.*, 44 F.3d 508, 513 (7th Cir.1995) (holding discretionary function exception applies to Coast Guard's formulation of inspection procedure because neither statute nor regulations specified course of conduct for Coast Guard inspectors in meeting goal of insuring compliance); *Cisco v. United States*, 768 F.2d 788, 789 (7th Cir.1985) ("Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes."). The DOD's formulation of its disposal plan is therefore properly classified as a discretionary function.

■ The question remains whether the discretion exercised by the DOD in determining the manner in which its sales would be conducted is the type of discretion which the exception seeks to protect. The congressional declaration of policy accompanying the FPASA states that it was Congress' intent "in enacting this legislation to provide for the Government an economical and efficient system for ... the disposal of surplus property...." 40 U.S.C. § 471. Congress left the means of carrying out its policy of economic and efficient disposal to the determination of the federal agencies. A decision by the DOD to inspect all of its surplus property, which, according to the government, includes everything from aircraft carriers to wild burros, to ensure that it is safe for use by the public necessarily would impact the efficiency with which the government could dispose of surplus property. Decisions such as these which require the balancing of safety and economics clearly fall within the discretionary function exception, as "the purpose of the

exception is to prevent judicial second-guessing" of administrative decision grounded in public policy. *Gaubert*, 499 U.S. at 323, 111 S.Ct. at 1273; *see also Maas*, 94 F.3d at 297 (stating that balancing cost and effectiveness of warning is discretionary decision covered by exception); *Cassens*, 44 F.3d at 514 (stating that inspection of vessel by Coast Guard involves balancing considerations of safety and economics and is discretionary function).[2]

We therefore conclude that the government is not subject to suit for damages stemming from the DOD's failure to require that the DRMS conduct pre-sale inspections and issue warnings. It may be that the DOD's failure to require these safeguards was an abuse of the discretion vested in that agency by Congress; however, when Congress has delegated both a task to an agency and the discretionary authority to make the policy-based judgments necessary to effectuate that task, an abuse of that discretion cannot form the basis for governmental liability.

Having concluded that the sale of the milling machine was a discretionary function, we briefly address Grammatico's contention that the discretionary function exception cannot bar his negligence claims in the absence of evidence that the government made a conscious decision to exercise its discretion to limit its liability for negligence. He argues that the "Sale by Reference" pamphlet's "as is" language evidences an intent by the government to limit only its liability arising from warranty, not negligence. In other words, he maintains that, absent evidence that the

---

2. We wish to clarify that the sale of property does not come within the discretionary function exception *because* it is conducted "as is." To the extent that the district court's analysis focused on the "as is" language in the "Sale by Reference" pamphlet, such analysis is misdirected. It is true that several courts, while noting that a given sale was made "as is," have held that the discretionary function exception shields the government from liability for injuries caused by the government's failure to conduct pre-sale inspections or to warn purchasers of the potential dangers of certain property. *See Kane v. United States*, 15 F.3d 87, 89 (8th Cir.1994) (holding Veterans Administration decision to sell property without inspection for asbestos within discretionary function exception); *Myslakowski v. United States*, 806 F.2d 94, 98 (6th Cir.1986) (holding decision

to sell postal trucks without warning purchasers of trucks' propensity to "roll-over" within discretionary function exception); *Smith v. Johns–Manville Corp.*, 795 F.2d 301, 308–09 (3d Cir. 1986) (holding GSA's decision to sell surplus asbestos without warning of health risks within discretionary function exception); *Ford v. American Motors Corp.*, 770 F.2d 465, 467–68 (5th Cir.1985) (holding failure to warn of postal trucks' propensity to "roll-over" within discretionary function exception). The "as is" nature of the sales, however, should not be viewed as the common denominator in these cases; rather, the unifying factor is the discretionary authority granted to the agencies in these cases to dispose of their property so as to effectuate certain public policy goals.

DOD made a decision to disclaim liability for negligence, no discretion has been exercised.

■ Appellant misapprehends the nature of the discretionary function exception. Once a discretionary function has been identified—in this case, the sale of surplus property—the government may not be held liable for its negligence in carrying out the discretionary act, regardless of whether the government has expressed an intention to disclaim liability for its actions. As the Supreme Court has explained, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325, 111 S.Ct. at 1275. Because the disposal of surplus property is a discretionary function grounded in public policy, the government is shielded from liability stemming from the exercise of its discretion whether or not the agency intended to disclaim liability for its actions.

### III.

■ Grammatico further contends that the sale of the milling machine does not fall within the discretionary function exception because the milling machine is a "hazardous" property under the Regulations and DRMS guidelines, which require that the agency warn purchasers of the risks associated with purchasing "hazardous" property. If federal regulations or DOD policies required the DOD to warn purchasers of milling machines of the potential risks associated with this machinery, the sale of the milling machine would not have involved an element of judgment or choice, as DRMS employees would have had "no rightful option but to adhere to the directive." *See Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988).

Grammatico correctly notes that the Regulations require that an agency inform prospective bidders of the dangers of "hazardous materials" and provide bidders with a list of precautions that they should take to protect themselves. *See* 41 C.F.R. § 101–42.404. We must therefore determine whether the milling machine is a "hazardous material" as that term is defined within the Regulations. "Hazardous materials" are defined as "property that is deemed a hazardous material, chemical substance or mixture, or hazardous waste under the Hazardous Materials Transportation Act (HMTA), the Resource Conservation and Recovery Act (RCRA), or the Toxic Substances Control Act (TSCA)." 41 C.F.R. § 101–42.001. The Regulations go on to state that a hazardous material generally has one or more of the following characteristics:

(a) Has a flash point below 200 F . . .;

(b) Is subject to polymerization with the release of large amounts of energy when handled, stored, or shipped without adequate controls;

(c) In the course of normal operations, may produce fibers, dusts, gases, fumes, vapors, mists, or smokes which have one or more of the following characteristics: (1) Causes 50 percent fatalities to test animals . . .;

(d) Is radioactive . . .;

(e) Is a recognized carcinogen . . .; or

(f) Possesses special characteristics which in the opinion of the holding agency could be hazardous to health, safety, or the environment if improperly handled, stored, transported, disposed of, or otherwise improperly used.

*Id.* Grammatico urges that subpart (f) of the definition of "hazardous material" is broad enough to encompass defective machinery that possesses characteristics that could be hazardous to the safety of the user.

■ We do not agree that subpart (f) can be read so broadly. Defective machinery could be brought within the purview of this definition only through a very strained reading of the regulation. As an initial matter, we note that Grammatico has not attempted to show that the milling machine falls within the general definition of "hazardous material"—namely, that it has been deemed hazardous under the HMTA, RCRA or TSCA. Further, it is clear from an examination of the regulations in their entirety that they pertain to substances which are harmful to individuals or to the environment by their very nature. Subsection (f), although it does

appear to be a "catch-all" provision, cannot be read to catch materials of an entirely different nature than those described in subsections (a) through (e), which describe the characteristics of hazardous materials in terms of flashpoint, toxicity, and radioactivity. *Cf. Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 174, 114 S.Ct. 1439, 1447, 128 L.Ed.2d 119 (1994) ("Section 10(b) is a catchall provision but what it catches must be fraud."); *Flora v. United States,* 362 U.S. 145, 149, 80 S.Ct. 630, 633, 4 L.Ed.2d 623 (1960) ("A catchall the phrase surely is; but to say this is not to define what it catches."). This general catch-all provision, because it is preceded by more specific provisions, is limited by the principle of *ejusdem generis,* under which a general term is understood as a reference to subjects akin to the ones with specific enumeration. *See Newsom v. Friedman,* 76 F.3d 813, 820 (7th Cir.1996) (citing *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991)).

▮▮▮▮▮ As this court has explained, in expounding a statute or regulation, "a court must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and to its object and policy." *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir.1982) (quoting *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 12 L.Ed. 1009 (1849)); *see also Nu-Pulse, Inc. v. Schlueter Co.,* 853 F.2d 545, 549 (7th Cir.1988) (collecting cases). Looking to the entire regulation and its object and policy, we conclude that this provision was intended to impose special reporting and handling requirements only for a certain class of materials that have been deemed particularly hazardous. Grammatico's reading of this provision would instead impose a general obligation on the agency to inspect property for defects to ensure that the property is in no way hazardous to the user. The principle of *ejusdem generis* is appropriately applied in this situation "to avoid the giving

of unintended breadth" to these regulations. *Newsom,* 76 F.3d at 820 (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961)).[3]

Grammatico next points to the DRMS Manual's requirement that prospective bidders be advised that "hazardous materials" require special precautions. As in the Federal Property Management Regulations, "hazardous property" is defined in the DRMS Manual with reference to specific physical properties such as flashpoint and radioactivity. In addition to the list of physical properties that are deemed hazardous, the manual cross-references certain other regulations that cover hazardous materials. Subsection (j) states that material is hazardous if "[t]he item is hazardous in accordance with OSHA 29 CFR 1910." Grammatico contends that the milling machine is "hazardous" under the Occupational Safety and Health Regulations and that the DRMS was therefore required to advise his employer of the risks associated with the milling machine.

An examination of section 1910 reveals over a thousand pages of workplace safety standards, some of which regulate the use of certain equipment, such as power tools, some of which regulate certain industries, such as sawmills, and some of which cover general safety concerns, such as the placement of emergency exits. Grammatico maintains that the detailed standards contained in these voluminous regulations are incorporated by the DRMS Manual, such that any violation of a workplace safety standard transforms property into a "hazardous material." Section 1910.212, covering "machine guarding," states that point of operation guarding should be provided. According to Grammatico, the failure to install this guarding rendered the machine "hazardous."

▮▮▮ Once again, we construe the DRMS Manual's definition of "hazardous property" by looking at the provision as a whole and with a view to its policy objective. As was true of the Regulations' provision on hazard-

---

**3.** Grammatico also argues that the definition of "extremely hazardous material" in the Regulations is broad enough to include any material which could endanger public health or safety. The milling machine does not fall within this

definition for the same reasons that it does not fall within the definition of "hazardous material." In addition, common sense dictates that a machine that is not "hazardous" is not "extremely" so.

ous material, the cited provision of the DRMS Manual is clearly directed at chemically and environmentally hazardous substances only. The cross-reference to the OSHA regulations cannot logically be read to incorporate the entire one thousand plus pages of OSHA standards within the definition of "hazardous property"; rather, the definition of "hazardous property" is properly read as incorporating only those portions of section 1910 which pertain to "hazardous materials"; for example, "Subpart H—Hazardous Materials" regulates substances such as flammable liquids and explosives. We therefore conclude that the DRMS Manual, like the federal regulations, were intended to create heightened disclosure requirements for a certain class of chemically and environmentally hazardous materials only.[4]

## IV.

For the foregoing reasons, the judgment of the district court dismissing appellant's complaint is AFFIRMED.

---

4. Grammatico also draws our attention to the following paragraph of the DRMS Manual:

26. Defective Items, Parts, and Components Containing Latent Defects. Property that is dangerous to public health, or safety by virtue of latent defects which are identified by technical inspection methods may not be transferred to DRMO ... without first rendering such property innocuous....

We agree with the government that this provision applies to property transferred to the DRMS from other agencies, rather than to property transferred to third parties, and applies only to latent defects which have been identified by technical inspection methods, such as radiographic inspection, prior to being transferred to the DRMS. In addition, the defects at issue in this case, such as the absence of safety guards, are not the type of defects contemplated by this paragraph, which covers defects that cannot be detected by "normal visual inspection methods."