Nancy Lee SMITH, individually and on her own behalf and on behalf of: Joshua Osborne, Jonathan Osborne and Thomas Osborne, minors by their parent and guardian Nancy Lee Smith, Kevin McGinn, individually and on his own behalf and on behalf of: Erin McGinn, Connor McGinn and Rebecca McGinn, minors by their parent and guardian Kevin McGinn, Dawn Hackett, Joseph Pecoraro, Linda Pecoraro and Michael Hurewitz, Plaintiffs,

v.

The UNITED STATES COAST GUARD, the States of America, John Does 1 – 50, and ABC Governmental Agencies 1 – 50, Defendants.

No. 01 CIV. 5936(WCC).

United States District Court,
S.D. New York.

Sept. 16, 2002.

Edward R. Petkevis, P.C. (Edward R. Petkevis, of counsel), Roebling, NJ, for Plaintiffs.

James B. Comey, United States Attorney, U.S. Department of Justice, Torts Branch, Civil Division (Chris P. Reilly, Stephen R. Campbell, Asst. United States Attorneys, of counsel), Washington, DC, for defendants, United States of America.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs, passengers on the vessel *Conservator* when it capsized on August 23, 1998, bring the instant action against the United States Coast Guard ("Coast Guard") and the United States of America (collectively the "United States") claiming, *inter alia*, that defendants were negligent in certifying the *Conservator* for the carriage of passengers, failing to warn plaintiffs of the vessel's dangerous condition and failing to conduct a reinspection of the vessel. The United States now moves to dismiss the Complaint pursuant to FED. R.CIV.P. 12(b)(1) for lack of subject matter jurisdiction, or alternatively, for summary judgment pursuant to FED.R.CIV.P. 56. For the reasons that follow, the United States' motion is granted.

## BACKGROUND[1]

On July 1, 1998, Joseph Mitlof purchased the *Conservator*, a 25–foot, tri-hull, open pontoon, flat deck boat, from the Maritime Aquarium at Norwalk, Inc. ("Norwalk Maritime"). (Defs.Rule 56.1 Stmt. ¶¶ 1, 5.) Norwalk Maritime had used the *Conservator* to conduct river ecology tours of the Norwalk River and had obtained a Certificate of Inspection ("COI") from the Coast Guard to operate the vessel lawfully. (*Id.* ¶ 6.) The most recent COI obtained by Norwalk Maritime prior to the *Conservator's* sale to Mitlof was issued on May 21, 1997 (the "1997 COI") with an expiration date of May 21, 2000. (*Id.* ¶ 9 & Ex. 1.) The 1997 COI stated that the *Conservator* could carry twenty pas-

---

1. The facts surrounding this action have been developed in related actions before this Court, familiarity of which is assumed. *See Smith v. Mitlof,* 198 F.Supp.2d 492 (S.D.N.Y.2002); *Smith v. Mitlof,* 148 F.Supp.2d 279 (S.D.N.Y. 2001); *Smith v. Mitlof,* 130 F.Supp.2d 578 (S.D.N.Y.2001). The facts relevant to the instant motion are taken from the Complaint and the parties' moving papers and Rule 56.1 Statements and are undisputed unless otherwise noted.

sengers plus one crew member, and restricted its operation to the "NORWALK CONNECTICUT HARBOR AREA, NOT MORE THAN ONE (1) MILE FROM SHORE, ON VOYAGES NOT TO EXCEED THIRTY MINUTES IN DURATION." (*Id.*, Ex. 1.) After he purchased the *Conservator*, Mitlof did not obtain a new or amended COI and did not apply to have the vessel reinspected. (*Id.* ¶¶ 11, 12.)

On August 23, 1998, the *Conservator*, operated by Daniel Sheehan, capsized while carrying twenty-seven passengers and two crew members on the Hudson River (the "Accident") in violation of the terms of the 1997 COI. (*Id.* ¶¶ 2, 13, 14.) Plaintiffs subsequently brought the instant action, claiming that the Coast Guard negligently permitted the *Conservator* to operate in an unseaworthy condition. (Complt.¶¶ 15, 22.) The United States now moves to dismiss the Complaint on the ground that the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), shields the United States from liability. In the alternative, the United States argues that summary judgment is appropriate because the intervening acts of Mitlof and Sheehan severed the causal chain between the Coast Guard's actions and plaintiffs' injuries.

## DISCUSSION

### I. *Motion to Dismiss Pursuant to 12(b)(1)*

█ In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to 12(b)(1), a court must "accept as true all material factual allegations in the complaint," *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998)

(citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (citing *Norton v. Larney*, 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)). In determining whether subject matter jurisdiction exists, a court may properly refer to evidence beyond the pleadings to resolve disputed jurisdictional facts. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). "Thus the standard used to evaluate a Rule 12(b)(1) claim is akin to that for summary judgment under FED. R.CIV.P. 56(e)." *Serrano v. 900 5th Avenue Corp.*, 4 F.Supp.2d 315, 316 (S.D.N.Y. 1998).

### II. *Discretionary Function Exception*

#### A. *Background*

█ Sovereign immunity shields the Federal Government and its agencies from suit unless immunity is waived. *FDIC v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The Suits in Admiralty Act ("SAA"), 46 App.U.S.C. §§ 741–52, under which this action would fall, waives the sovereign immunity of the United States in cases where "if a private person or property were involved, a proceeding in admiralty could be maintained." 46 App.U.S.C. § 742. Unlike the FTCA, the SAA does not contain an express discretionary function exception. 28 U.S.C. § 2680(a).[2] However, the Second Circuit expressly held that the exception applies equally to the SAA. *See In re Joint Eastern and Southern Districts Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir.1989). The discretionary function exception "insulates

---

**2.** The discretionary function exception of the FTCA shields the United States, in part, from: "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

the Government from liability if the action challenged ... involves the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The exception demonstrates Congress's desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Where the discretionary function exception applies, the court lacks subject matter jurisdiction over the action. *Merritt v. Shuttle, Inc.*, 13 F.Supp.2d 371, 380 (E.D.N.Y.1998) (citing *Garcia v. United States*, 826 F.2d 806, 809 (9th Cir.1987)).

In *Varig Airlines*, the plaintiffs challenged the use by the Federal Aviation Administration ("FAA") of a "spot-check" program to monitor compliance with safety standards and suitability for airworthiness certification.[3] *Id.* at 816–17, 104 S.Ct. 2755. Specifically, the plaintiffs maintained that the FAA was negligent in failing to inspect certain aspects of aircraft design in the process of certification to ensure compliance with fire safety standards. *Id.* at 814–15, 104 S.Ct. 2755. The Court held that the FAA's certification of an aircraft as airworthy was an exercise of regulatory authority and thus subject to the discretionary function exception. The Court first explained that in choosing to implement the "spot-check" program for compliance review, the FAA was "exercising discretionary regulatory authority of the most basic kind" because it accommodated "the goal of air transportation safety and the reality of finite agency resources."

*Id.* at 819–20, 104 S.Ct. 2755. Furthermore, the Court held that FAA employees executing the "spot-check" program in accordance with agency policy were shielded by the discretionary function exception. As the Court explained:

> The FAA employees who conducted compliance reviews of the aircraft ... were specifically empowered to make policy judgments.... In administering the "spot-check" program, these FAA engineers and inspectors necessarily took calculated risks, but those risks were encountered for the advancement of a governmental purpose and pursuant to the specific grant of authority in the regulations and operating manuals. Under such circumstances, the FAA's alleged negligence in failing to check certain specific items in the course of certifying a particular aircraft falls squarely within the discretionary function exception of § 2680(a).

*Id.* at 820, 104 S.Ct. 2755.

In *Berkovitz*, however, the Court expressly rejected the contention that the discretionary function exception precluded liability for all acts arising out of the regulatory programs of federal agencies, 486 U.S. at 538, 108 S.Ct. 1954, and reversed a Court of Appeals ruling that the discretionary function exception barred a claim against the Division of Biological Standards ("DBS") for wrongful inspection and approval of a polio vaccine. *Id.* at 548, 108 S.Ct. 1954. The first claim in *Berkovitz* was that the DBS issued a polio vaccine without receiving test data from the manufacturer as required by statute. After reviewing the applicable regulations, the Court held that DBS employees had no discretion to issue a license to produce a

---

**3.** The "spot-check" program requires the aircraft manufacturer to develop the plans and perform the necessary inspections and tests to establish that the aircraft design conforms with FAA regulations. The FAA then reviews the data by conducting a "spot check" of the manufacturer's work. *Varig Airlines*, 467 U.S. at 817–18, 104 S.Ct. 2755.

polio vaccine without first receiving test data from the manufacturer because to do so would "violate a specific statutory and regulatory directive." *Id.* at 542–43, 108 S.Ct. 1954.[4] As the Court explained:

> the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. . . . [I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Id.* at 536, 108 S.Ct. 1954.

The plaintiffs in *Berkovitz* also claimed that the DBS issued a license to produce a polio vaccine even though the vaccine did not comply with certain safety standards. *Id.* at 543, 108 S.Ct. 1954. The Court explained that there were three ways that this second claim could be understood. If the plaintiffs' claim charged the DBS with licensing the vaccine either without first determining whether it complied with regulatory standards or after determining that it failed to comply, the discretionary function exception would pose no bar to suit. *Id.* at 544, 108 S.Ct. 1954. This was because, under the regulatory scheme in question, the DBS could not approve a license for a polio vaccine without examining the product and determining whether it complied with regulatory standards. *Id.* However, if the claim was that the DBS made an erroneous determination of compliance, the applicability of the discretionary function would turn on "whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception." *Id.* at 544–45, 108 S.Ct. 1954. The

Court thus explained that "if the policies and programs formulated by the [agency] allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion." *Id.* at 546, 108 S.Ct. 1954. However, "if the acts complained of do not involve the permissible exercise of policy discretion" the discretionary function does not apply. *Id.* at 544, 108 S.Ct. 1954.

■ In evaluating whether particular governmental conduct falls under the discretionary function exception, courts engage in a two-step analysis. *See United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Coulthurst v. United States,* 214 F.3d 106, 108–09 (2d Cir.2000). First, the court must determine whether the action at issue "involves an element of judgment or choice" for the acting employee. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954 (citing *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)). The court must then "determine whether that judgment is of the kind that the discretionary function exception was designed to shield," namely, "actions and decisions based on considerations of public policy." *Id.* at 536–37, 108 S.Ct. 1954.

In their opposition to the United States' motion to dismiss, plaintiffs maintain that their action is based on the Coast Guard's failure to exercise due care in performing a duty specifically mandated by the Code of Federal Regulations ("CFR") and agency policy. (Pls.Mem.Opp.Mot. Dismiss at 2.) Plaintiffs assert that the Coast Guard was required to follow highly detailed procedures before issuing a COI to the *Con-*

---

4. The specific directives cited by the Court were 42 U.S.C. § 262(d) (license shall issue "only upon a showing" by the manufacturer) and 21 C.F.R. § 601.2 (1987) (application for a license deemed as filed only upon receipt of relevant test data). *See* 486 U.S. at 542, 108 S.Ct. 1954.

*servator* for the carriage of passengers, and that their failure to do so resulted in the certification of an unseaworthy vessel.[5] (*Id.* at 7–19.) The United States, on the other hand, argues that Coast Guard employees are granted discretionary authority during the inspection and certification of small passenger vessels, thus implicating the discretionary function exception. (Defs.Reply Mem.Supp.Mot. Dismiss at 6.) In order to resolve these competing arguments, it is necessary to consider the regulatory scheme at issue.

## B. *Coast Guard Inspection and Certification*

The Secretary of Transportation, pursuant to 46 U.S.C. § 3306, is empowered to prescribe regulations to "secure the safety of individuals and property on board vessels subject to inspection." 46 U.S.C. § 3306(a). In general, the scope of Coast Guard inspections is governed by 46 U.S.C. § 3305 which provides, in part:

(a) The inspection process shall ensure that a vessel subject to inspection—

(1) is of a structure suitable for the service in which it is to be employed;

(2) is equipped with proper appliances for lifesaving, fire prevention, and firefighting;

(3) has suitable accommodations for the crew ... and for passengers on the vessel if authorized to carry passengers;

(4) is in a condition to be operated with safety to life and property; and

(5) complies with applicable marine safety laws and regulations.

*Id.*

The implementing regulations applicable to the inspection of the *Conservator* appear in 46 C.F.R. Chapter I, Subchapter T which governs the inspection and certification of small passenger vessels.[6] Small passenger vessels may not be operated without a valid COI. 46 C.F.R. § 176.100 (1997). Before it can issue a COI, the Coast Guard is required to conduct an inspection of the vessel. 46 C.F.R. § 176.400(a).

---

**5.** In its motion to dismiss, the United States discussed the discretionary function exception's application to claims involving the Coast Guard's failure to reinspect the *Conservator* and failure to warn prospective passengers. (Defs.Mem.Supp.Mot. Dismiss at 17–20.) As the United States points out, no statute or regulation required the Coast Guard to reinspect the *Conservator* absent a request from the owner. (*Id.* at 19–20; *see* 46 C.F.R. § 176.105 (an application must be made to the Coast Guard to obtain or renew a COI).) Similarly, no statute or regulation requires the Coast Guard to warn prospective passengers if a vessel is unsafe. (*Id.* at 18; *see Gercey v. United States,* 540 F.2d 536, 538 (1st Cir.1976) (Coast Guard has no duty to warn the public of an unsafe or decertified vessel).) In their opposition to the United States' motion to dismiss, however, plaintiffs discuss only the claims involving the alleged negligent inspection and certification of the *Conservator.* (Pls.Mem.Opp.Mot. Dismiss at 5.) Thus, this Court will consider the discretionary function exception only as it applies to the

inspection and certification of the *Conservator* by the Coast Guard. All other claims against the Coast Guard are dismissed.

**6.** In their opposition papers, plaintiffs cite Subchapter T regulations from both the 1990 and 1997 code editions. As plaintiffs explain, a complete revision of the regulations governing the inspection of small passenger vessels went into effect on March 11, 1996. (Pls.Mem.Opp.Mot. Dismiss at 6.) The last Coast Guard inspection of the *Conservator* was conducted in 1997. Plaintiffs cite provisions from the 1990 code edition because the *Conservator* was first inspected and certified by the Coast Guard in April of 1990. (*Id.,* Ex. C.) It is unclear, however, how the 1990 inspection is relevant to the instant action. In 1997, the Coast Guard conducted a new inspection of the *Conservator* and issued a new COI for the carriage of passengers. (*See* Defs. Mem.Supp.Mot. Dismiss, Ex. 1; Pls. Mem.Opp.Mot. Dismiss, Ex. 1.) This Court will consider only the CFR provisions in effect in 1997.

As plaintiffs point out, the regulatory standards in Subchapter T are highly detailed. 46 C.F.R. § 176.800 *et seq.* Plaintiffs cite a number of regulations with which they claim the *Conservator* failed to comply, and maintain that the Coast Guard employee inspecting the *Conservator* was required to determine compliance with each of these regulations before issuing a COI. (*See* Pls.Mem.Opp.Mot. Dismiss at 8–20.) However, contrary to plaintiffs' suggestion, none of the regulations cited require the Coast Guard to conduct specific tests or inspections prior to issuing a COI.[7] Although the regulations provide that "a vessel is inspected for compliance with the standards required by [Subchapter T]," 46 C.F.R. § 176.800(a), the regulations do not specify the means by which the Coast Guard inspector is to determine compliance.[8]

■ In *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508 (7th Cir. 1995), a passenger who fell on the stairway of a vessel certified by the Coast Guard claimed that the Coast Guard wrongfully certified the vessel in the absence of handrails. *Id.* at 510. The Seventh Circuit determined that the statutes and regulations governing the marine vessel inspection program did not specify a course of conduct for Coast Guard inspectors to follow. *Id.* at 513–14. For example, considering the directive of 46 U.S.C. § 3305 that the "inspection process shall insure" compliance, the Seventh Circuit concluded that the statute merely set goals for the inspection process rather than required steps for inspectors to perform. *Id.* at 513. In the absence of specific directives, the Seventh Circuit concluded that it was "within the individual inspector's discretion how to conduct the inspection." *Id.* at 514. Moreover, the Seventh Circuit held that the judgments made by Coast Guard inspectors in the course of their duties met the second requirement for the application of the discretionary function exception because they required "balancing considerations of safety and economics with reference to the needs and uses of the particular vessel being inspected." *Id.* at 514–15 (citing *Gaubert,* 499 U.S. at 323, 111 S.Ct. 1267). Following the reasoning in *Cassens,* we conclude that because none of the regulations cited by plaintiffs in the instant action directed Coast Guard inspectors to take specific steps in inspecting the *Conservator,* the inspectors had discretion to determine how to conduct the inspection. *Id.* at 514. Because the Coast Guard inspectors were permitted to make judgments concerning the inspection process, and because these judgments implicated considerations of public policy, any alleged negligence in failing to detect non-compliance was shielded by the discretionary function exception. *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. 2755.

7. Plaintiffs also argue that provisions of the Coast Guard's Marine Safety Manual (the "Manual") (Pls.Mem.Opp.Mot.Dismiss, Ex. B), dictate procedures that Coast Guard inspectors are required to follow. (*Id.* at 12–13.) However, there is no language indicating that the Manual's provisions are required of, rather than recommended to, Coast Guard employees. In fact, the introduction to the section cited by plaintiffs states that the section "provides *guidance* on the application of the regulations in [the C.F.R.]." (*Id.,* Ex. B § 6.A.3 (emphasis added).)

8. For example, 46 C.F.R. § 176.802 cited by plaintiffs provides that the owner of a vessel "shall be prepared to conduct tests and have the vessel ready for inspections of the hull structure including the following ... [listing types of inspections]." This provision places a duty on the vessel's owner to "have the vessel ready" for possible inspections, but leaves it to the discretion of the Coast Guard inspector to determine which inspections to conduct.

Plaintiffs argue that even assuming the regulations do not prescribe a specific course of conduct for Coast Guard inspectors to follow, the Coast Guard does not have the discretion to issue a COI to a non-complying vessel. (Pls.Mem.Opp.Mot. Dismiss at 20; *see Cassens*, 44 F.3d at 515.) Plaintiffs maintain that the Coast Guard issued a COI to the *Conservator* despite a specific finding that the *Conservator* lacked hull integrity. (Pls.Mem.Opp.Mot. Dismiss at 20.) Indeed, the Court in *Berkovitz* explained that the discretionary function exception would pose no bar to suit if the DBS had issued a license to produce a vaccine after determining that the vaccine failed to comply with regulatory standards. 486 U.S. at 544, 108 S.Ct. 1954. However, plaintiffs' argument fails to recognize that Coast Guard inspectors are given discretion to vary the application of inspection standards based on the intended operation of the vessel. The regulations provide that "[i]n the application of inspection standards due consideration must be given to the hazards involved in the operation permitted by a vessel's Certificate of Inspection. Thus, the standards may vary in accordance with the vessel's area of operation or any other operational restrictions or limitations." 46 C.F.R. § 176.800(b). The evidence submitted in connection with this action contains many examples in which Coast Guard inspectors took into account Norwalk Maritime's limited use of the *Conservator*. (*See, e.g.,* Pls. Mem.Opp.Mot. Dismiss, Ex. H (inspection book noting that the requested area of operation for the *Conservator* was within the Norwalk Harbor area not more than one mile from shore and no longer than thirty minutes in duration).) Moreover, the 1997 COI reflects that certification of the *Conservator* for the carriage of passengers was dependent on its use in this restricted area. (Defs.Mem.Supp.Mot. Dismiss, Ex. 1 (stating that the permitted route for the vessel was restricted to the Norwalk Harbor area, not more than one mile from shore).) Because the regulations specifically allow for the modification of inspection standards based on a vessel's intended use, the Coast Guard had discretion to issue a COI to the *Conservator* notwithstanding its knowledge that the inspection did not exactly conform to these standards.[9]

Furthermore, as explained above, the Coast Guard inspector's judgment concerning the application of inspection standards based on the intended use of the vessel is the type of policy decision the discretionary function exception is designed to protect. *See Berkovitz*, 486 U.S. at 536–37, 108 S.Ct. 1954; *Cassens*, 44 F.3d at 514–15 (judgments made by Coast Guard employees in conducting vessel inspections "require balancing considerations of safety and economics with reference to the needs and uses of the particular vessel being inspected."). In addition, "the very existence of [a regulation allowing discretion] creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to

**9.** This conclusion also defeats plaintiffs' argument with respect to the Coast Guard's failure to conduct a stability test. (Pls.Mem.Opp.Mot. Dismiss at 10–14); *see* 46 C.F.R. § 178.320(b) ("A pontoon vessel operating on protected waters must undergo a simplified stability proof test ... in the presence of a Coast Guard marine inspector."). During the 1990 inspection of the *Conservator*, the inspector waived a stability test in part because of the limited route requested. (Pls.Mem.Opp.Mot. Dismiss, Ex. C ¶ 13.) Although this exemption was granted in 1990, *see infra* note 6, it carried over to the 1997 inspection. (*See id.*, Ex. A p. 241 (a stability test is a "one time issue").) Moreover, in the record of the 1990 inspection, the inspector noted that the waiver was valid only while the vessel was operating in the Norwalk Harbor area. (*Id.*, Ex. C ¶ 13.)

the promulgation of the regulation." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims against the Coast Guard are barred by the discretionary function exception to the SAA's waiver of sovereign immunity. Accordingly, this action is dismissed with prejudice for lack of subject matter jurisdiction.

SO ORDERED.