Nathaniel SCOTT, Plaintiff,

v.

UNIVERSAL FIDELITY COR-
PORATION, and Terry W.
Simonds, Defendants.

No. 98 C 3659.

United States District Court,
N.D. Illinois,
Eastern Division.

March 19, 1999.

Daniel A. Edelman, Edelman & Combs, Chicago, IL, for plaintiff.

John Michael Hynes, Clausen Miller P.C., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

KEYS, United State Magistrate Judge.

This matter comes before the Court on Plaintiff's Motion to Compel Defendants to produce responses to written discovery requests. Whether to grant the motion turns on the meaning of "net worth" under the Fair Debt Collection Practices Act ("the FDCPA"), 15 U.S.C. § 1692 et seq.[1] For the reasons set forth below, Plaintiff's motion is granted.

## BACKGROUND

This action arises out of a claim under the FDCPA. Plaintiff Nathaniel Scott is a debtor from whom Defendants sought to collect a balance of $194.66 owed on his Sears credit card. (Complaint at 1.) Defendants are Universal Fidelity Corporation ("Universal"), a Texas-based debt collector, and Terry W. Simonds, president and director of Universal. (Id. at 2.)

On July 22, 1998, Plaintiff served first discovery requests on Defendants. (Plain-

---

1. The FDCPA is intended to "eliminate abusive debt collection practices ...." 15 U.S.C. § 1692(e).

tiff's Motion to Compel [Pl.'s Mot. Compel] at 1). Defendants served their responses to Plaintiff's requests to admit on September 8, 1998. (*Id.*) On November 11, 1998, Defendants responded to Plaintiff's interrogatories and document requests, and on January 12, 1999, Defendants served amended responses to the document requests. (*Id.*) However, Defendants objected to many requests and refused to provide any documents regarding the net worth, as defined by fair market value, of Universal or Mr. Simonds. (*Id.*)

On January 15, 1999, Plaintiff moved to compel Defendants to answer the requests for admission and interrogatories, as well as to produce documents, related to the net worth of Universal and Mr. Simonds. (*Id.*) These include requests for admission 32, 33, 34, 35, and 36 (concerning Mr. Simonds' net worth),[2] interrogatories 8 and 9 (net worth of Defendants, identification of assets, liabilities and asset transfers), and document requests 9, 12, 13, 19, 21, 22, 25, 26, and 27 (net worth of Defendants and Universal's minute book). (*Id.* at 3–4.)

## DISCUSSION

### I. THE MEANING OF NET WORTH UNDER THE FDCPA

The FDCPA provides that debt collectors who fail to comply with the act are, in the case of class actions,[3] liable to all class members for the lesser of $500,000 or 1% of the net worth of the debt collector. 15 U.S.C. § 1692k(a)(2)(B) Yet, nowhere does the FDCPA define the meaning of net worth, a term for which there is more than

one possible definition. Plaintiff contends that the proper measure of the Defendant Universal's net worth under the FDCPA is its fair market value. (Pl.'s Mot. Compel at 1.) Defendants contend that the appropriate measure of Universal's net worth is its book value. (Defendants' Response to Plaintiff's Motion to Compel [Defs.' Resp.] at 2.) In support of their argument, Defendants cite *Sanders v. Jackson*, in which the term net worth, as used in the FDCPA, was held to mean "the difference between assets and liabilities as determined in accordance with generally accepted accounting principles (GAAP)....." 33 F.Supp.2d 693 (N.D.Ill.1998).

Universal's net worth varies greatly depending on the formula used to calculate it. Universal's fair market value is approximately $1,800,000, while its book value is $101,353. Under the FDCPA, plaintiffs may not recover more than 1% of a defendant's net worth. 15 U.S.C. § 1692K(a)(2)(B)(ii). Thus, the maximum recovery is $18,000 if Universal's net worth is its fair market value and $1,013 if its net worth is its book value.

### A. Standards for Statutory Interpretation

 When construing the meaning of a statute enacted by Congress, a court must first look to the language of that statute. *Newsom v. Friedman*, 76 F.3d 813, 816 (7th Cir.1996) (citing *United States v. Hudspeth*, 42 F.3d 1015, 1022 (7th Cir.1994), *cert. denied*, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995), "we

---

**2.** Despite Defendant Simonds' argument that information concerning his personal assets is irrelevant because the Court lacks personal jurisdiction over him, and despite the pendency of a motion to dismiss Mr. Simonds from the complaint for that reason, this Court on February 1, 1999, ordered that Mr. Simonds produce the documents and answer the requests to admit relating to his net worth, as well as answer questions during his deposition concerning same. Therefore, the only issue remaining under this motion is the production of documents and answering of interrogatories regarding the net worth of Defendant Universal.

**3.** On March 4, 1999, the Court recommended granting Plaintiff's Motion to certify a class of all Illinois residents who meet the following criteria: (1) on or after July 1, 1997; (2) they were sent "collection letters in the form" identical to the letter sent to Mr. Scott; (3) by Universal Fidelity Corporation; (4) "in connection with the attempted collection of debts for non-business purposes;" and (5) "which letters were not returned as undeliverable by the Postal Service." (Report and Recommendation on Class Certification [Rep. and Rec. Class Certif.] at 3–4.)

may turn to the legislative history to interpret a statute only when the statute is ambiguous."). If a term is not defined by statute, a court construes the word in accord with its plain or ordinary meaning. *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *see Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 342 (7th Cir.1997) ("divining congressional intent from an absence of expression is a quagmire that we must try to avoid."). However, if the plain language of a statute is ambiguous, a court must turn to the statute's legislative history in order to determine the intent of the drafters. *Crandon v. United States*, 494 U.S. 152, 153, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (court will look not only to the statutory language but to the design of the statute as a whole and to its object and policy.).

Since the FDCPA does not define net worth, the Court will first examine the plain meaning of the term. The Court will then consider the purpose of the FDCPA.

### B. The Plain Meaning of the Term Net Worth

To determine the plain meaning of a word in a statute, the Seventh Circuit has relied on the dictionary definition thereof. *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1325 (7th Cir. 1997). Black's Law Dictionary defines net worth as "[t]he amount by which assets exceed liabilities. Remainder after deduction of liabilities from assets ... The total assets of a person or business less the total liabilities." BLACK'S LAW DICTIONARY, 1041 (6th ed.1990). Black's defines assets as "[p]roperty of all kinds, real and personal, tangible and intangible...." Intangible assets are defined as "[a]ssets lacking physical existence; e.g. patents, trademarks, organization costs, goodwill." *Id.* at 118.

Book value, by contrast, does not account for intangible assets. As a result, using book value as a valuation formula results in relatively low estimations of businesses' values. Judge Posner has explained that

[b]ook value is a virtually meaningless index .... The main component of book value is the original cost of the firm's assets, as depreciated. Wholly apart from the well-known vagaries of depreciation, if a firm's assets are specialized to the firm's business, they may have very little sale value. Their only value may be to generate the firm's earnings. But then it is clear that the value of the firm is some multiple of its earnings, and not some function of the original cost of its assets.

*Beerly v. Dept. of Treasury*, 768 F.2d 942, 946 (7th Cir.1985).

In interpreting the meaning of net worth under the FDCPA's damages provision, the *Sanders* court asserted that Congress would have used the term fair market value instead of net worth if it had intended the measure of damages to be 1% of a debt collector's fair market value. *Sanders*, 33 F.Supp.2d at 696. However, Congress just as easily could have used the term book value to cap debt collectors' damages. *See* 50 App. U.S.C.A. § 32(a)(2)(D) (1988), Trading With the Enemy Act of 1917 (capping aggregate returns at book value not to exceed $9,000,-000); Merchant Marine Act, 46 App. U.S.C.A. § 883–1(d) (1998), (limiting aggregate book value of vessels owned by a United States corporation to 10% for purposes of United States citizenship).

Thus, the Court turns to the legislative history of the FDCPA for further guidance as to the meaning of the term net worth.

### C. The Purpose of the FDCPA

In enacting the FDCPA, "Congress tipped the balance between debtor and debt collector to correct what it determined were abuses in debt collection practices." *Newsom*, 76F.3d at 816 (citing *Jenkins v. Heintz*, 25 F.3d 536, 537 (7th Cir.1994), *aff'd*, 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995)). The legislative history of the FDCPA reveals Congress' interest in protecting "consumers from a host of unfair, harassing and decep-

tive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." S.Rep. No. 382, 95th Cong., 1st Sess. 1–2, 5, reprinted in 1977 in U.S.C.C.A.N. 1695, 1696.

The FDCPA protects debt collectors' interests by restricting the damages recoverable for violations of the act. Damages recoverable under 15 U.S.C. § 1692k include actual damages, reasonable attorney's fees, and a discretionary damage award. 15 U.S.C. § 1692k. In class actions, in addition to actual damages recovered by the named plaintiff, damages may not "exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." [4] 15 U.S.C. § 1692k(a)(2)(B).

Yet, it is clear that Congress intended the FDCPA to deter abusive debt collection practices. The statute's statement of purpose provides:

(a) ... Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy....

(e) It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors....

15 U.S.C. § 1692(a) & (e). Such abusive practices may include "threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process." *Bass*, 111 F.3d at 1324.

### 1. *FDCPA Damages are Similar to Punitive Damages*

■■■■ Damages for FDCPA violations are punitive in nature. Punitive damages are intended to deter future misconduct by defendants. *See Brown and Williamson Tobacco Corporation v. Jacobson and CBS, Inc.*, 827 F.2d 1119, 1143 (7th Cir. 1987) (finding that damages of $2,000,000

would "provide some deterrence to future misconduct and yet will not burden CBS with debt it cannot easily discharge."). For this reason, a defendant's net worth is an appropriate consideration in assessing punitive damages. *Cash v. Beltmann North American Company, Inc.*, 900 F.2d 109, 111 (7th Cir.1990).

In *Cash*, the Seventh Circuit relied on defendant's four-year old corporate tax return to determine that a punitive damages award of 8.29 percent of defendant's net worth could be "a dangerous financial drain" on the defendant. Nevertheless, the court expressed concern that the tax return, which was four years old at the time of trial, provided "weak evidence of Beltmann's true net worth." *Id.* Evidently, the court's interest was in ensuring that the damages award reflect the actual economic value of the defendant. Similarly, FDCPA damages reflect Congress' interest in encouraging debt collectors to comply with the act, while capping damages in class actions at 1% of the debt collector's net worth. 15 U.S.C. § 1692k(a)(2)(B).[5]

Moreover, like punitive damages, FDCPA damages take into account the nature of the defendant's conduct. The Senate Report on the FDCPA states:

In assessing damages, the court must take into account the nature of the violation, the degree of willfulness, and the debt collector's persistence. A debt collector has no liability, however, if he violates the act in any manner, including with regard to the act's coverage, when such violation is unintentional and occurred despite procedures designed to avoid such violations....

S.Rep. No. 382, 95th Cong., 1st Sess. at 5, reprinted in 1977 in U.S.C.C.A.N. at 1700. In addition, in *Kobs v. Arrow Service Bureau Inc.*, the Seventh Circuit held that

---

4. In addition, "[i]n order to protect debt collectors from nuisance lawsuits, if the court finds that an action was brought by a consumer in bad faith and for harassment, the court may award the debt collector reasonable attorney's fees and costs." S.Rep. No.

382, 95th Cong., 1st Sess. at 5, reprinted in 1977 in U.S.C.C.A.N. at 1700.

5. The *Cash* Court noted that "a typical ratio for a punitive damages award to a defendant's net worth may be around one percent." *Cash*, 900 F.2d at 111.

the FDCPA requires trial by jury in determining statutory damages additional to plaintiff's actual damages. *Kobs v. Arrow Service Bureau, Inc.,* 134 F.3d 893 (7th Cir.1998). The *Kobs* Court cited *Johnson v. Eaton,* 80 F.3d 148, 151–52 (5th Cir. 1996), in which the Fifth Circuit considered additional statutory damages under the FDCPA "punitive in nature." *Kobs,* 134 F.3d 893, 897.

FDCPA damages, like punitive damages, are designed to deter violation of the law. If damages in class actions were capped at 1% of a debt collector's book value, debt collectors would have little incentive to comply with the FDCPA because. the potential liability would be so small. Debt collectors could afford to incur such damages as a mere cost of doing business. However, assessing damages based on a debt collector's fair market value is consistent with the FDCPA's purpose of eliminating abusive debt collection practices without harming ethical debt collectors.

### 2. *Sanders v. Jackson*

The Court respectfully declines to follow *Sanders v. Jackson,* which held that the defendant's net worth under the FDCPA was the book value of the debt collection company. *Sanders,* 33 F.Supp.2d at 696. The *Sanders* Court relied on *Continental Web Press, Inc. v. NLRB. Id.* That case is distinguishable, in this Court's opinion. *Continental Web Press,* which dealt with attorneys' fees under the Equal Access to Justice Act ("EAJA"), relied on the legislative history of that act to hold that a small business's eligibility for attorney's fees from the government should be determined by using the book value of the applicant because the proceeding to collect these fees "was intended to be summary." *Continental Web Press, Inc. v. NLRB,* 767 F.2d 321, 322–23 (7th Cir.1985).

However, a summary proceeding to collect attorneys' fees from the government is not analogous to the calculation of a debt collector's damages for violating the FDCPA. In an EAJA summary proceeding, the defendant's ultimate liability is not at issue. The issue as to whether the government's position was substantially justified has already been resolved, and the only remaining question is whether the plaintiff qualifies as a small business for purposes of receiving attorneys' fees from the government. In a FDCPA case, by contrast, a court is willing to delve into the details of a defendant's finances in order to ensure that the award of damages for violating the act is appropriate. *See Cole v. Commissioner of Internal Revenue,* No. 9757–84, 1987 WL 40313 (U.S.Tax Ct. May 4, 1987), *aff'd,* 871 F.2d 64 (7th Cir.1989) ("for net worth to properly reflect the economic value of a business, it must be defined as fair market value of assets over liabilities.").[6]

### 3. *Fair Market Value Prevents Damage Assessments Based on Manipulated Books*

Using book value as a valuation method for assessing FDCPA damages poses an additional risk: debt collectors could artificially lower their liability under the FDCPA by increasing salaries, declaring dividends, making loans and incurring other business expenses. However, by defining net worth as fair market value, courts are able to assess damages based on defendants' actual net worth, regardless how defendants keep their books.

■ Thus, the Court finds that the meaning of net worth under the FDCPA is fair market value.

## II. *MOTION TO COMPEL DISCOVERY*

Plaintiff's Motion to Compel Discovery is granted. Defendants must respond to Plaintiff's requests for admission 32, 33,

---

**6.** Although the *Sanders* Court found *Cole* to be distinguishable, this Court finds that since FDCPA damages are punitive in nature and therefore should be assessed in light of defendants' ability to pay and likelihood of being deterred from future violations, *Cole*'s standard for valuing a business is appropriate. *See Sanders,* 33 F.Supp.2d at 697.

34, 35, and 36 (to the extent Defendant Simonds has not already done so), answer Plaintiff's interrogatories 8 and 9, and produce documents 9, 12, 13, 19, 21, 22, 25, 26, and 27. Each of these documents pertains to the net worth of Defendants Universal and Mr. Simonds.

## CONCLUSION

The Court finds that the proper measure of a defendant's net worth in a FDCPA case is its fair market value. Therefore, the Court grants Plaintiff's motion to compel discovery of documents related to Defendants' net worth.