In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1673

Michelle Sanders, individually and on behalf
of all others similarly situated,

Plaintiff-Appellant,

v.

John Lee Jackson and Universal Fidelity
Corporation, a Texas Corporation,

Defendant-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 0209--Morton Denlow, Magistrate Judge.

Argued November 30, 1999--Decided April 20, 2000

Before Manion, Kanne, and Rovner, Circuit Judges.

Manion, Circuit Judge.  When Michelle Sanders
failed to pay a small debt she received a
collection letter from Universal Fidelity
Corporation. She claims that as an
"unsophisticated debtor" she found the letter
confusing and misleading. Despite her
unsophistication, she quickly contacted a lawyer
and initiated a class action lawsuit under the
Fair Debt Collection Practices Act (FDCPA or the
Act). The parties eventually settled, but they
did so without agreeing on a specific sum of
compensation. Rather, they merely agreed that
Universal Fidelity would pay the class the
maximum damages to which it would be entitled
under the Act. The FDCPA makes class action
damages dependent upon the "net worth" of the
defendant. The parties disagreed as to the
meaning of this term, but the district court held
on summary judgment that net worth means book
value net worth, as opposed to fair market net
worth. We affirm.

I.

The Fair Debt Collection Practices Act provides
that "in the case of a class action the total
recovery shall not exceed the lesser of $500,000
or 1 per centum of net worth of the debt

collector . . . ." 15 U.S.C. sec. 1692k(a)(2)(B) (emphasis added). Since the parties have settled the liability phase of the litigation, the remaining issue involves the calculation of damages. This appeal arises out of the parties' dispute over the meaning of the term "net worth" which is not defined by the Act. The district court agreed with Universal Fidelity's argument that net worth means the book value of the company, that is, assets listed on the company's balance sheet minus liabilities, which is also sometimes called "balance sheet net worth." See Sanders v. Jackson, 33 F. Supp.2d 693 (N.D. Ill. 1998). But another district court in a nearly identical case reached a different conclusion. See Scott v. Universal Fidelity Corp., 42 F. Supp.2d 837 (N.D. Ill. 1999). Scott held, as Sanders argues, that net worth includes Universal Fidelity's goodwill, i.e., the value of the company beyond the book value of its net tangible assets./1 In other words, the court believed that net worth means "fair market net worth." In this case the different interpretations result in substantially different recoveries because the book value of Universal Fidelity is about $100,000, while Sanders alleges that its fair market value is around $1,800,000. Therefore we must decide whether the FDCPA uses the term net worth to denote fair market net worth, which includes goodwill, or balance sheet net worth, which does not.

The FDCPA does not define net worth and so we must address this question using our rules of statutory interpretation. The cardinal rule is that words used in statutes must be given their ordinary and plain meaning. United States v. Wilson, 159 F.3d 280, 291 (7th Cir. 1998). We frequently look to dictionaries to determine the plain meaning of words, and in particular we look at how a phrase was defined at the time the statute was drafted and enacted. See Molzof v. United States, 502 U.S. 301, 307 (1992); Newsom v. Friedman, 76 F.3d 813, 817 (7th Cir. 1996). But in this case we see that the dictionary simply confirms the root problem: the term net worth has more than one meaning. The fourth edition of Black's Law Dictionary, which was the current edition in 1977 when the FDCPA was enacted, defines net worth as simply the difference between assets and liabilities. Black's Law Dictionary 1192 (4th ed., 1968). Assets are defined as anything available for the payment of debts, which in the case of an ongoing business does not include goodwill. Id. at 151. Thus the edition of Black's that was current when the Act became law generally supports Fidelity's position. The latest edition, the seventh, similarly defines net worth as assets minus liabilities. Its primary definition of "asset" is

an "item that is owned and has value." Black's Law Dictionary 112 (7th ed., 1999). Assuming the term "item" denotes tangibility and specific identity, two attributes not usually ascribed to goodwill, this definition suggests that goodwill should not be a factor in the calculation of net worth. Thus, this first definition supports Universal Fidelity's position. Predictably, Sanders advises us to ignore the first definition and suggests instead that we look to the second definition, which specifically includes goodwill among several examples of assets./2 But aside from the fact that there is no cogent reason for adopting the second definition over the first, all that the second definition demonstrates is that in some contexts goodwill should be considered an asset. This proposition is of course true, but when interpreting this statute our task is to find the ordinary and usual meaning of the term net worth, not the broadest possible meaning of the term asset. Neither party provides us with a dispositive reason for adopting one dictionary definition over another. Thus we find that these varying definitions are not particularly helpful.

Another guide to interpretation is found in the construction of similar terms in other statutes. United States v. Bates, 96 F.3d 964, 968 (7th Cir. 1996); see Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 823 (3d Cir. 1999); Veiga v. McGee, 26 F.3d 1206, 1211 (1st Cir. 1994). There are many statutes which use the term net worth. Some, like the FDCPA, limit class recoveries to a certain percentage of a defendant's net worth. See, e.g., Real Estate Settlement Procedure Act, 12 U.S.C. sec. 2605(f)(2)(B)(ii); Expedited Funds Availability Act, 12 U.S.C. sec. 4010(a)(2)(B)(ii); Truth in Savings Act, 12 U.S.C. sec. 4310(a)(2)(B)(ii); Homeowners Protection Act, 12 U.S.C. sec. 4907(a)(2)(B)(i); Truth in Lending Act, 15 U.S.C. sec. 1640(a)(2)(B); Equal Credit Opportunity Act, 15 U.S.C. sec. 1691e(b); Electronic Funds Transfer Act, 15 U.S.C. sec. 1693m(a)(2)(B)(ii). Others limit recovery to plaintiffs whose net worth is below a certain threshold amount. See, e.g., Securities and Exchange Act, 15 U.S.C. sec. 78u-4(g)(4)(A)(i)(II); Y2K Act, 15 U.S.C. sec. 6605(d)(1)(A)(i)(II). But both types of statutes use the term net worth in the same sense and are therefore instructive in the present case.

One of these latter types of statutes is the Equal Access to Justice Act, which permits parties that prevail against the government to obtain the costs of litigation, but only if the individual's "net worth does not exceed $2,000,000." 5 U.S.C. sec. 504(b)(1)(B). In Continental Webb Press Inc. v. N.L.R.B., we

examined the term "net worth" in the context of this EAJA provision. 767 F.2d 321, 323 (7th Cir. 1985). There the NLRB argued that in calculating net worth, Continental's assets should be valued at cost rather than cost minus depreciation. We held that the proper valuation entails a depreciation of the assets because that is the procedure prescribed by generally accepted accounting principles.

Congress did not define the statutory term "net worth." It seems a fair guess that if it had thought about the question, it would have wanted the courts to refer to generally accepted accounting principles. What other guideline could there be? Congress would not have wanted us to create a whole new set of accounting principles just for use in cases under the Equal Access to Justice Act.

Id. This holding is consistent with our prior holding in Telegraph Savings and Loan Association v. Schilling that GAAP should also be used to determine a bank's net worth as that term is defined by federal banking statutes. 703 F.2d 1019, 1027-28 (7th Cir. 1983). Not surprisingly, when the Ninth Circuit was asked to define net worth for purposes of the EAJA, it also held that GAAP should govern. American Pac. Concrete Pipe Co., Inc. v. N.L.R.B., 788 F.2d 586, 591 (9th Cir. 1986) (adopting this reasoning and holding of Continental Webb Press).

   Implicit in these holdings is the conclusion that the statutory term net worth means book net worth or balance sheet net worth, because GAAP has meaning only in the context of financial statement reporting--GAAP dictate the standards for reporting and disclosing information on an entity's financial statements./3 While those cases involved different statutes, we believe their reasoning applies equally to the FDCPA. Accordingly, because there is no indication in the FDCPA that the term net worth should be used in anything but its normal sense, we also look to book net worth or balance sheet net worth as reported consistently with GAAP.

   Universal Fidelity's 1997 balance sheet includes assets of $1,729,802.00 and liabilities of $1,628,449.00, for a book net worth of $101,353.00. The balance sheet does not report goodwill. While Sanders contends that we should increase Universal Fidelity's listed assets by the value of its goodwill, which at this point is unknown, that would be inconsistent with GAAP. GAAP provides that internally developed goodwill is not reported on a company's financial statements; rather, goodwill is only reported at the time a business is sold for more than its

book value net worth. Thus, applying GAAP, as we believe Congress would have wanted, c.f., Continental Webb Press Inc., Universal Fidelity's balance sheet valuation should not include goodwill.

The rationale underlying the GAAP treatment of goodwill also supports our conclusion that the statutory term net worth means balance sheet net worth. As the Accounting Principles Board has explained, goodwill is not reported absent a business combination because "its lack of physical qualities makes evidence of its existence elusive, [and] its value . . . often difficult to estimate, and its useful life . . . indeterminable." Accounting Principles Board, Opinion. No. 17, para. 17.02 (1970). The Board also recognizes that the value of goodwill often fluctuates widely for innumerable reasons and that estimates of its value are often unreliable. Based in part on these concerns, the Accounting Principles Board has adopted its rule concerning goodwill--absent a business combination, it is not reported as an asset of the company.

We also must consider whether this definition of net worth is consistent with the purposes of the FDCPA's net worth provision, because a statute must be interpreted in accordance with its object and policy. See Holloway v. United States, 119 S. Ct. 966, 969 (1999); Grammatico v. United States, 109 F.3d 1198, 1204 (7th Cir. 1997). Here, the net worth clause is designed to address a problem often associated with fixed monetary penalties: they sometimes penalize smaller companies too harshly but are also insufficiently punitive for larger businesses. See Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996). Thus, by making the extent of the penalty directly proportional to a percentage of the defendant's net worth, Congress hoped that punishment might be meted out according to a business's ability to absorb the penalty. See id.; Zaz Designs v. L'Oral, S.A., 979 F.2d 499, 508 (7th Cir. 1992) (discussing the rationale behind fixing monetary penalties according to the defendant's wealth or lack thereof). The key aspect of this net worth provision is not its punitive nature, as Sanders argues, but a recognition that an award of statutory punitive damages may exceed a company's ability to pay and thereby force it into bankruptcy. Kemezy, 79 F.3d at 35. Thus, we agree with the Fifth Circuit that the primary purpose of the net worth provision is a protective one. It ensures that defendants are not forced to liquidate their companies in order to satisfy an award of punitive damages. Boggs v. Alto Trailer Sales, Inc., 511 F.2d 114, 118 (5th Cir. 1975) (identical provision in TILA was designed to protect businesses from catastrophic damage

awards).

   With this purpose in mind, we see that Universal Fidelity's interpretation of net worth makes more sense than Sanders's does. Since the 1% of net worth limitation was designed to identify that portion of a company's assets which safely could be liquidated to satisfy an award of damages without forcing the breakup of that company, factoring goodwill into the calculation of net worth defeats the purpose of the provision because ordinarily goodwill "cannot be disposed of apart from the enterprise as a whole." ABP Op. No. 17, para. 17.32. Since goodwill cannot be severed from the company, and thus is not readily available for the payment of judgments, it should not influence the calculation of net worth. A contrary holding would contradict the key purpose of the net worth provision. The text of the FDCPA and cases interpreting it clearly indicate that de minimis violations should not be punished with such severity that the companies are deprived of existence. Furthermore, there is no provision that limits defendants being exposed to more than one FDCPA class action lawsuit, which is exactly what happened to the defendant in this case. See also Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997) (discussing the possibility of serial FDCPA suits). When this possibility is factored in, Sanders's interpretation of "net worth" proves even more onerous and thus, highly implausible.

   Another probable purpose of the provision is to make the damage calculation easy for the parties and trial judges. Examining the balance sheet of a company and subtracting the liabilities from the assets is a simple and accurate calculation. Sanders argues that factoring goodwill into the equation would not be so difficult, but as mentioned above, due to its transitory nature, goodwill is extremely difficult to quantify and value with any certainty. APB Op. No. 17, para. 17.02. Goodwill can fluctuate significantly in the marketplace. It has no value as a security interest. Until there is a fair market value sale, goodwill is speculative at best. In short, the calculation of statutory damages should not result in a mini trial; the statute seeks to avoid a separate contest over damages by using the term net worth to denote a company's book value net worth. As with the EAJA, this statute does not contemplate the layer of complexity which Sanders's interpretation would require. See United States v. 88.88 Acres of Land, 907 F.2d 106, 108 (9th Cir. 1990) (the determination of net worth under the EAJA should not result in a second major litigation).

   Sanders also contends that a failure to include

goodwill in the equation will diminish plaintiffs' recoveries and thereby destroy any incentive for FDCPA class action litigation. But from the plaintiffs' point of view, the primary motivation for these suits is not and should not be the plaintiffs' belief that the suit will result in a substantial windfall. Plaintiffs in FDCPA class actions who are not claiming actual damages cannot reasonably expect large awards for what are technical and de minimis violations of the Act. Mace, 109 F.3d at 344. Moreover, the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." Id. Thus, it is the plaintiffs' recognition that their claims are relatively insignificant which induces them to sue as one body. "Because the class action device lowers plaintiffs' litigation costs below the level that would be incurred by bringing individual suits, the class action reduces the level of damages necessary to produce litigation." John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669, 684 (1986). While an increased recovery might provide slightly greater incentive for plaintiffs to sue and to monitor their lawsuits, see Greisz v. Household Bank (Illinois), N.A., 176 F.3d 1012, 1013 (7th Cir. 1999), monetary gain for the class members is obviously not the main impetus for these class actions.

Rather, the driving force behind these cases is the class action attorneys. They have a strong incentive to litigate these cases--oftentimes despite their marginal impact--in the form of attorneys' fees and costs they hope to recover. The award of such fees is mandatory in FDCPA cases. See Zagorski v. Midwest Billing Servs., Inc., 128 F.3d 1164, 1166 (7th Cir. 1997) (per curiam); Tolentino v. Friedman, 46 F.3d 645, 651 (7th Cir. 1995). Not surprisingly, then, "FDCPA litigation is a breeding ground for class actions." Lawrence Young & Jeffrey Coulter, Class Action Strategies in FDCPA Litigation, 52 Consumer Fin. L.Q. Rep. 61, 70 (1998). As this court noted in Mace, it is these attorneys' fees which are a significant inducement for FDCPA class action lawsuits. 109 F.3d at 344; see Goldberger v. Integrated Solutions, Inc., No. 99-7198, 2000 WL 320447, at *10 (2d Cir. Mar. 28, 2000) (in many class action cases the plaintiffs "are mere 'figureheads' and the real reason for

bringing such actions is 'the quest for attorney's fees.'")./4 Unfortunately, as Judge Winter of the Second Circuit has noted, these attorney fees strongly encourage class actions, many of which are frivolous. See Ralph K. Winter, Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America, 42 Duke L. J. 945, 949 (1993). The history of FDCPA litigation shows that most cases have resulted in limited recoveries for plaintiffs and hefty fees for their attorneys. Consider the recent case of Crawford v. Equifax Payment Servs., Inc., where a negotiated settlement provided $2,000 to the class representative, $78,000 to the plaintiff's attorneys, and nothing for the rest of the class. 201 F.3d 877, 880 (7th Cir. 2000) (reversing the approval of the settlement). The impetus of that suit clearly was not the plaintiffs' share of the award. See Winter, supra, at 949 (in derivative class action settlements, plaintiffs recover only 50% of the time while their attorneys receive fees in 90% of the cases). Crawford and similar cases illustrate "the all-too-common abuse of the class action as a device for forcing the settlement of meritless claims and is thus a mirror image of the abusive tactics of debt collectors at which the statute is aimed." White v. Goodman, 200 F.3d 1016, 1019 (7th Cir. 2000). Assuming that Crawford is somewhat typical of other FDCPA cases in this respect, our holding today will not, as Sanders suggests, stem the tide of FDCPA cases flooding this circuit. And if the definition of net worth advocated by Sanders were applied to the numerous statutes that use that term as a measure of damages, the incentive for more litigation would be explosive and destructive. Most defendant corporations would be valued well beyond their ability to pay short of bankruptcy or liquidation.

Finally, Sanders and her class argue that our interpretation of net worth will not result in sufficient punishment of defendants. Again, Sanders overlooks the fact that the FDCPA suits usually entail significant awards of attorneys' fees, above and beyond any damages awarded. Although the attorneys' fees provision of the Act may or may not have been designed to be punitive per se, we have noted that attorneys' fees are punitive in the broad sense of the term in that they deprive the defendant of capital and thereby provide a strong incentive not to violate the law in the future. Mace, 109 F.3d at 344 (the attorney's fee provision punishes by "helping to deter future violations" by the defendant); Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers, 26 F.3d 842, 848 (8th Cir. 1994). The Sixth Circuit is correct in noting that, on top of the damages awarded, the costs

and attorneys' fees provisions in the FDCPA provide a substantial punishment which undoubtedly deters similar conduct. See Wright v. Finance Serv. of Norwalk, Inc., 22 F.3d 647, 651 (6th Cir. 1994) (en banc). And let us not forget that any egregious debt collection practices which cause actual losses to debtors are fully compensable according to the actual damages provision of the FDCPA. 15 U.S.C. sec. 1692k(a)(1). Our interpretation of the net worth provision has no effect on such suits by individuals, and thus Sanders's suggestion that our holding will result in insufficient punishment of egregious conduct has no reasonable foundation.

In sum, the words of the statute, an understanding of its purposes, and cases interpreting the term net worth indicate that this term means balance sheet or book value net worth. As such, goodwill should not be factored into the calculation of the defendant's net worth. Accordingly, we affirm the decision of the district court and disapprove the contrary position adopted by another district court in Scott v. Universal Fidelity Corporation.

Affirmed.

/1 We have previously defined "goodwill" as "an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets. It often includes the company's name recognition, consumer brand loyalty, or special relationships with suppliers or customers." In re Prince, 85 F.3d 314, 322 (7th Cir. 1996).

/2 Without giving a reason, Sanders also asks us to ignore the third definition of asset found in Black's latest edition. The third definition tends to support Universal Fidelity's interpretation by defining "asset" as any property which a person can use to pay a debt. As we discuss below, goodwill cannot be used to pay a company's debts.

/3 The term "'generally accepted accounting principles' is a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations." American Institute of

Certified Public Accountants, Statement of
Auditing Standards No. 69, para. 69.02 (1992)
(emphasis added and citation omitted).

/4 In 1999, there were 417 class action lawsuits
pending in the district courts of the Seventh
Circuit. Of these, 311 were pending in the
Northern District of Illinois. Administrative
Office of the United States Courts, Judicial
Business of the United States Courts Table X-4
(2000).