Nancy Lee SMITH, Joshua Osborne, Jonathan Osborne, Thomas Osborne, Kevin McGinn, Erin McGinn, Connor McGinn, Rebecca McGinn, Dawn Hackett, Joseph Pecoraro, Linda Pecoraro and Michael Hurewitz, Plaintiffs,

v.

Joseph MITLOF, et al., Defendants/Third–Party Plaintiff,

v.

The Maritime Aquarium at Norwalk, Inc., Third–Party Defendant.

No. 99 CIV. 10833(WCC).

United States District Court, S.D. New York.

June 20, 2001.

Edward R. Petkevis, P.C. (Edward R. Petkevis, of Counsel), Roebling, NJ, for Plaintiffs.

Joseph Mitlof, Nyack, NY, for Defendant/Third–Party Plaintiff Pro Se.

Harwood Lloyd LLC (David T. Pfund, of Counsel), Hackensack, NJ, for Third–Party Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

In this personal injury action, third-party defendant Maritime Aquarium at Norwalk ("Norwalk Maritime" or "NM") moves for summary judgment pursuant to FED. R. CIV. P. 56 against defendant/third-party plaintiff Joseph Mitlof, individually and d/b/a: Hudson Valley Waterways, Tappan Zee Water Taxi and Tours, Tarrytown Water Taxi and Nyack Water Taxi. Plaintiffs Nancy Lee Smith, Joshua Osborne, Jonathan Osborne, Thomas Osborne, Kevin McGinn, Erin McGinn, Connor McGinn, Rebecca McGinn, Dawn Hackett, Joseph Pecoraro, Linda Pecoraro and Michael Hurewitz, passengers aboard Mitlof's pontoon boat, *Conservator*, who were injured when it capsized, join Mitlof in opposing Norwalk Maritime's motion.

Plaintiffs brought the instant suit in October 1999,[1] alleging that the boat sank due to the negligence of Mitlof and Daniel Sheehan;[2] plaintiffs then moved for summary judgment as to Mitlof's liability. On August 16, 2000, after plaintiffs' summary judgment motion was fully submitted, Mitlof sued Norwalk Maritime—from whom Mitlof purchased *Conservator*—alleging, *inter alia*, that Norwalk Maritime misrepresented the boat's seaworthiness to Mitlof at the time of sale and seeking indemnification or contribution from Norwalk Maritime for any damages resulting from the accident.

In an opinion and order dated February 16, 2001, this Court applied the *Pennsylvania* rule and held Mitlof liable for *Conservator*'s capsizing. *See Smith v. Mitlof*, 130 F.Supp.2d 578, 583 (S.D.N.Y.2001) ("*Smith I* "). Mitlof appealed that decision to the Second Circuit Court of Appeals on March 13, 2001.[3] On June 6, 2001, that

---

1. In August 2000, plaintiffs also filed suit against the United States Coast Guard in the District of New Jersey, alleging that it negligently inspected *Conservator* in 1997 and negligently failed to inspect the boat after Mitlof purchased it from Norwalk Maritime. By consent of the parties, that action will be transferred to this Court.

2. Sheehan, *Conservator* 's master on the day of the accident, is currently in default and has submitted nothing in the instant action. On May 11, 2001, the U.S. Attorney for the Southern District of New York indicted both Mitlof and Sheehan on criminal charges of conspiracy, misconduct or neglect of ship officers and wire fraud.

3. On May 7, 2001, Mitlof filed a "Notice of Motion" for relief from the *Smith I* judgment

Court dismissed the appeal for lack of jurisdiction in the absence of a final order. Norwalk Maritime now moves for summary judgment, seeking dismissal of all of Mitlof's claims. For the reasons stated below, Norwalk Maritime's motion is granted in part and denied in part.

## BACKGROUND [4]

Mitlof operated a charter and water taxi service on the Hudson River serving Tarrytown, Nyack and Pierpont, New York. On August 23, 1998, Mitlof's pontoon boat *Conservator* left Nyack carrying 27 passengers and 2 crewmen, and capsized north of the Tappan Zee Bridge. All persons on board were sent into the water, and one passenger was trapped and drowned. The United States Coast Guard ("USCG") investigated the accident, conducted a formal hearing on August 26 and 28, 1998, and issued two marine casualty reports. Mitlof and Sheehan invoked their Fifth Amendment privilege against self-incrimination and refused to testify at the hearing. The following events led up to the accident.

*Conservator* was built in 1970 and underwent unspecified "major repairs" in 1983. (*See* Pls. Mem. Opp. Summ. J., Ex. C.) Its owner prior to Norwalk Maritime, the Saugatuck Valley Audubon Society

("Saugatuck"), submitted the boat for a certificate of inspection ("COI") from the USCG on March 23, 1990. *Conservator* failed its hull integrity test, but the USCG stated that

> [t]he requested area of operation is the Norwalk Harbor Area to include the Norwalk Islands not more than one nautical mile from shore. As [is] noted ... the vessel has been operating on the above route for approximately the past 20 years. If you can provide acceptable documentation of the past five years of operation then the structural adequacy of the hull will be considered acceptable.

(*Id.*, Ex. A at 1.) Saugatuck provided this information to the USCG by letter dated May 16, 1990. (*See id.*, Ex. C.) The USCG also stated that "[t]he inherent stability of this design [a 3–pontoon boat] and the limited route requested does not warrant a stability test. This exemption only [sic] while the vessel is operating on the route specified [*i.e.*, the Norwalk Harbor Area]." (*Id.*, Ex. A at 3.) [5] Saugatuck donated *Conservator* to Norwalk Maritime in or around September 1990.

Norwalk Maritime used *Conservator* "for public river-ecology cruises on the Norwalk River from the Spring of 1991 through the Summer of 1998." (NM Rule

pursuant to FED. R. CIV. P. 60(b), but filed no supporting affidavits or memorandum of law. Since the ultimate decision on Norwalk Maritime's liability potentially affects only Mitlof's damages, and not his own liability, his Rule 60(b) "motion" is denied.

4. The facts and prior proceedings in a related action arising out of the same incident are set forth in this Court's April 17 and December 15, 2000 Opinions and Orders, familiarity with which is assumed. *See Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154 (S.D.N.Y.2000); *Hartford Fire Insurance Company v. Mitlof*, 123 F.Supp.2d 762 (S.D.N.Y.2000) (*"Hartford"*). The instant facts are taken from all

parties' moving papers and exhibits, and are viewed in a light most favorable to Mitlof and plaintiffs, the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We note that much of the following information was presented for the first time on the instant motion, and therefore recognize that minor factual inconsistencies may exist between the "background" section of this opinion and that of *Smith I. Compare infra* at 282–84 *with* 130 F.Supp.2d at 579–80.

5. Apparently the USCG issued a COI to Saugatuck at that point, but no party has submitted a copy of this document.

56.1 Stmt., Ex. A ¶ 2.) This use complied with the restricted route the USCG imposed on *Conservator* when Saugatuck owned it. Norwalk Maritime made ordinary repairs on and improvements to *Conservator* throughout its ownership period. (*See id.*, Exs. B–D, F.) On at least two occasions before Norwalk Maritime sold *Conservator* to Mitlof, the boat experienced mechanical problems: its engines stalled once; and one of the pontoons began taking on water another time. (*See* Mitlof Mem. Opp. Summ. J., Ex. 22; Pls. Mem. Opp. Summ. J., Ex. F.)

Norwalk Maritime received its last COI from the USCG on May 21, 1997.[6] The USCG performed "credit drydock [sic] and internal structural exams" of the boat, authorized Norwalk Maritime to operate *Conservator* in the "Norwalk, Connecticut Harbor Area, not more than one (1) mile from shore, on voyages not to exceed thirty (30) minutes in duration," and allowed a maximum of 21 persons on board. (*See* NM Rule 56.1 Stmt., Ex. E.) The COI mistakenly states that *Conservator* was built in 1990, makes no mention of a stability test or the boat's overall stability, and lists an expiration date of May 2000. (*See id.*)

On September 3, 1997, Norwalk Maritime also had *Conservator* inspected by an independent marine inspector, Precision Marine Services ("Precision"). Precision inspected the boat both "afloat" and "hauled," but did not conduct a "sea trial" on it. (*See* NM Rule 56.1 Stmt., Ex. G at 1.) Its report states that *Conservator*'s hull was in "good" condition, and that the "three fiberglass pontoons [are] well maintained with no damage sighted." (*Id.*) Precision's report also states that the "hulls [were] tested for osmosis and inspected for damage and found to be

sound." (*Id.* at 4.) Precision's "overall risk evaluation" found the boat "good for coastal 1 mile limit operation." (*Id.*) It is unclear from the evidence submitted whether Norwalk Maritime informed either the USCG or Precision that one of *Conservator*'s pontoons had taken on water. After the Precision inspection, *Conservator* was dry docked until sold.

Sometime later, Norwalk Maritime decided to sell *Conservator* and ran the following classified advertisement in a boating newsletter:

> 26′ × 12″ TRI–HULL 3 PONTOON Flat deck, current C.O.I., USCG 20 + 1 passengers with twin 40 HP Yamaha outboards only 50 hrs., center helm, excellent condition. Asking $15,000.

(*Id.*, Ex. H.) On April 18, 1998, Mitlof met with Mike Pinto, captain of the boat, to discuss purchasing it. Pinto gave Mitlof a copy of the COI and the boat's registration, and Mitlof left a deposit. (*See id.*, Ex. I.) Two days later, Mitlof sent a note containing a letter to Jack Schneider, a Norwalk Maritime biologist who oversaw the educational program, indicating that Mitlof intended to use *Conservator* to conduct river tours for people with disabilities. (*See* Mitlof Mem. Opp. Summ. J., Exs. 21, 21A–C.) The letter does not specify which river.

On June 2, 1998, Mitlof sent a short note to Schneider, which reads in relevant part: "Also need Captain Mike [Pinto] to advise Re: coast guard inspection? If hull needed, I would prefer it be done at your facility since I plan on splashing the boat and taking it over by water route. This would avoid hauling again." The note also contains an arrow drawn from the above paragraph that points to a hand-written note, signed "Mike" (presumably Pinto),

---

6.  It is unclear how many previous COIs Norwalk Maritime applied for or had been issued, and no party has submitted documentary proof thereof.

which states: "Next required hull inspection for TMA is 1999 September. Check with USCG to see if they require hull inspection when vessel ownership changes." (*See id.,* Ex. 17; Pls. Mem. Opp. Summ. J., Ex. E.) It is unclear whether Norwalk Maritime ever made such inquiry to the USCG or relayed the required inspection date to Mitlof.

Mitlof purchased *Conservator* from Norwalk Maritime on July 1, 1998 for $12,000. (*See* NM Rule 56.1 Stmt., Exs. J, K.) Sometime thereafter, Mitlof contacted the USCG's New York district to inquire about having the boat reinspected. He received verbal assurance that this would be unnecessary, but he never sought or secured this assurance in writing;[7] a reinspection was thus never performed. On August 13, 1998, Schneider sent *Conservator*'s COI to the USCG, apparently at the USCG's request. (*See id.,* Ex. L.)

## DISCUSSION

Mitlof claims that Norwalk Maritime fraudulently misrepresented *Conservator*'s seaworthiness in the advertisement and created an express warranty by stating that the boat held a "current COI." (*See* 3d-Party Complt. ¶ 11.) He further claims that by selling the boat in its allegedly unseaworthy condition, Norwalk Maritime breached this express warranty in violation of U.C.C. § 2–313. (*See id.* ¶ 14.) He also alleges that Norwalk Maritime sold *Conservator* to him knowing that he intended to use it on the Hudson River, but failed to inform him that the boat was unsuitable for such use (*see id.* ¶ 15), and

instead gave him a "documented certified marine survey" that purported to confirm such use (*see id.* ¶¶ 12, 15–16), both which violated U.C.C. § 2–315. Finally, he claims that Norwalk Maritime negligently failed to inform the USCG of the boat's sale and transfer in violation of 46 C.F.R. § 176.120. (*See id.* ¶ 13.)

## I. *Summary Judgment Standard*

Under Fed. R. Civ. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson,* 477 U.S. at 247–50, 106 S.Ct. 2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court should resolve all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to dis-

---

7. In *Smith I,* we found that Mitlof had "presented no convincing evidence that he sought to have *Conservator* inspected and certified after purchasing it from Norwalk Maritime." 130 F.Supp.2d at 582. Although the issue is far from definitively resolved, Mitlof has presented more evidence to support this claim. (*See* Mitlof Mem. Opp. Summ. J., Exs. 8–11A.)

Moreover, because Mitlof is the nonmovant on this motion, we resolve all factual ambiguities in his favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, for the purposes of this motion, we find that Mitlof contacted the USCG, attempting to have *Conservator* reinspected and recertified.

cern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). Summary judgment may not be granted simply because the court believes the nonmovant will not be able to meet the burden of persuasion at trial. *Danzer v. Norden Sys.,* 151 F.3d 50, 54 (2d Cir.1998).

**II. Choice of Law**

▪ Mitlof's claims create a choice of law issue, for although this Court has admiralty jurisdiction over the accident and applied New York law thereto in *Smith I,* see 130 F.Supp.2d at 582–83, at the times when the ad ran and when the sale was made, *Conservator* was dry docked at Norwalk Maritime in Connecticut, but Mitlof resided in New York. " 'The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.' Where no [such] conflict exists … there is no reason to engage in a choice of law analysis." *Elson v. Defren,* 726 N.Y.S.2d 407, 411 (1st Dep't 2001) (internal citations omitted). Mitlof claims that Norwalk Maritime violated U.C.C. §§ 2–313 and 2–315, which both New York and Connecticut have adopted verbatim by statute. *See* N.Y. U.C.C. §§ 2–313, 2–315; Conn. Gen. Stat. Ann. §§ 42a–2–313, 42a–2–315. Furthermore, in New York, "[t]o constitute fraud, a misrepresentation must have been knowingly and intentionally made to the plaintiff, whose damages follow from reasonable reliance upon the misstatement." *Mayes v. UVI Holdings, Inc.,* 280 A.D.2d 153, 723 N.Y.S.2d 151, 157 (1st Dep't 2001); in Connecticut, to prevail on a fraudulent misrepresentation claim, plaintiffs must prove "by clear and convincing evidence (1) that the defendants made [a] false representation of fact; (2) that they knew the representation was false; (3) that they made the representation to induce plaintiffs to buy

the [product]; and (4) that the plaintiffs acted upon the false representation to their injury." *Jarsen v. Gunther,* No. CV0071986S, 2001 WL 438822, at *3 (Conn.Super.Ct. April 12, 2001). Comparing the two states' laws, we find no conflict.

▪ Moreover, under New York's "interest analysis" test, " 'significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.' " *Elson,* 726 N.Y.S.2d 407, 412 (quoting *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985)). Norwalk Maritime is located in Connecticut, and the sale of the boat—which resulted in part, at least, upon the advertisement—occurred in Connecticut; New York's sole connection to the case was Mitlof's residence at the time he bought *Conservator.* On balance then, the totality of circumstances favors applying Connecticut law to the case.

**III. Fraudulent Misrepresentation**

▪ Mitlof claims that Norwalk Maritime committed fraudulent misrepresentation by advertising that *Conservator* held a valid USCG COI, "notwithstanding said vessel's absolute unsuitability and inherent unseaworthiness for *any* commercial passenger service." (3d-Party Complt. ¶ 11 (emphasis in original).) Norwalk Maritime counters by relying on both Precision's and the USCG's positive inspection reports, stating that "clearly, the Conservator had no dangerous propensities known to the aquarium." (NM Mem. Supp. Summ. J. at 2.) Plaintiffs add that Norwalk Maritime "knew of a variety of problems with the vessel, and failed to disclose same." (Pls. Mem. Opp. Summ. J. at 6.) Norwalk Maritime disputes plaintiffs' assertion, and states that "the fact that one of the pontoons once took on some water is

an innocuous and immaterial fact, as evidenced by the [USCG's] finding that the Conservator was 'in all respects in conformity with the applicable vessel inspection laws.'" (NM Reply to Pls. Mem. Opp. Summ. J. at 4 (citing May 21, 1997 USCG COI).)

Although nothing Norwalk Maritime stated in the ad was false on its face, its assertion that *Conservator* was in "excellent condition" is questionable in view of the boat's having taken on water, as admitted by Norwalk Maritime. (*See id.*)[8] The ad correctly stated that the boat contained a "current C.O.I." and accurately listed its limitations ("USCG 20+1 passengers"), but this statement only told half the story. It is unclear whether Norwalk Maritime informed the USCG or Precision of the pontoon incident, and whether this information would have adversely affected both inspectors' reports. Such knowledge may have led the USCG to perform a stability test on the boat, and may have prompted Precision to conduct a sea trial on it. These questions cannot be resolved without testimony from USCG and Precision personnel. Thus, a material question of fact exists, because, based upon the evidence presented, a jury reasonably could conclude that Norwalk Maritime intentionally withheld the pontoon incident from the marine inspectors. Therefore, we must deny Norwalk Maritime's motion for summary judgment as to the fraudulent misrepresentation claim.

**8.** This admission casts into question Norwalk Maritime's assertion that "clearly, the Conservator had no dangerous propensities known to the aquarium." (NM Mem. Supp. Summ. J. at 2.) Norwalk Maritime cites *Delta Marine, Inc. v. Whaley*, 813 F.Supp. 414 (E.D.N.C. 1993) to support its position. However, this case, which states that "[s]trict liability to give an adequate warning will be imposed for civil admiralty claims only upon a showing

## IV. *Breach of Express Warranty*

■ Mitlof also claims that Norwalk Maritime breached an express warranty by "negligently, willfully and recklessly consummat[ing] the sale of [*Conservator*] in violation of UCC Article 2, 313, 1(a)."[9] (3d-Party Complt. ¶ 14.) Norwalk Maritime argues that "the only express warranty made by [it] was in the classified advertisement in which it affirmed that it held a current [COI] for the Conservator," and that since such a COI was issued, "it cannot be disputed that when this express warranty was made, prior to the sale of the vessel, [NM] indeed held a current [COI] for the Conservator." (NM Mem. Supp. Summ. J. at 8.) The U.C.C. applies to the sale of boats and vessels, *see Delta Marine*, 813 F.Supp. at 419, and provides that

> [e]xpress warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

CONN. GEN. STAT. ANN. § 42a–2–313(1)(a).

Although it is undisputed that *Conservator* held a COI at the time of sale, as stated *supra* in section II., Norwalk Maritime's potential non-disclosure of a material fact to the USCG—*i.e.*, the pontoon taking on water—reasonably could have affected whether the COI would have been issued, thus potentially rendering it void

that the seller knew or should have known about the hazard which it failed to warn," *id.* at 417, tends to support Mitlof's and plaintiffs' arguments.

**9.** Although Mitlof's Third–Party Complaint cites the general U.C.C., because we are applying Connecticut law to the case, we will cite the Connecticut statutes when referring to the relevant U.C.C. provisions.

*ab initio. Cf. Pacific Resources, Inc. v. Oswego Shipping Corp.,* No. 79 Civ. 1606, 1984 WL 928, at *7 (S.D.N.Y. Sept. 26, 1984) (regarding marine insurance contracts, failure of insured to disclose to insurer fact "that is material to the risk . . . allows the insurer to have the contract declared void *ab initio* "); *see also King v. Aetna,* 54 F.2d 253 (2d Cir.1931) (same). In *Pacific Resources,* the court stated that

> [s]hipowners have a duty to disclose to the classification society any condition which would affect the seaworthiness of the vessel. . . . It follows, then, that when the owner/operator discharges its duty to the classification society it also fulfills its duty to disclose any fact material to the risk which the insurers have agreed to undertake. Any condition which would affect seaworthiness of the vessel would presumably be material to that risk, affecting both the value of the ship and the probability that a casualty might occur.

1984 WL 928, at *8; *see also Delta Marine,* 813 F.Supp. at 417.

The court earlier surmised that "[i]f, as alleged, defendants intentionally withheld evidence of structural deficiencies, the revelation of which would have led to corrective action that would have prevented the loss, defendants would likely be liable in admiralty on one or more legal theories." *Pacific Resources,* 1984 WL 928, at *1. Moreover, the court stated that "[t]he question whether a material circumstance was concealed is for the trier of fact." *Id.* at *8. We believe the principles espoused by the *Pacific Resources* court apply here.[10] Therefore, because a jury reasonably could find that Norwalk Maritime had a duty to disclose the pontoon incident to

the USCG, which may in turn have adversely affected the COI or even prevented its issuance, we must deny Norwalk Maritime's motion for summary judgment as to the breach of express warranty claim.

**V. Breach of Implied Warranty of Fitness For a Particular Purpose**

■ Mitlof next alleges that Norwalk Maritime breached an implied warranty of fitness for a particular purpose by selling *Conservator* to him knowing that he intended to use it on the Hudson River and failing to inform him that the boat was unsuitable for such use (*see* 3d-Party Complt. ¶¶ 15, 16), which violated CONN. GEN. STAT. ANN. § 42a–2–315. Norwalk Maritime contends that § 42–a–2–315 "is not applicable to the present circumstances [because] there is no evidence that [Mitlof] relied on the 'skill or judgment' of [NM] in deciding whether the Conservator would be suitable for [Mitlof's] purposes [or] that [NM] *knew* [Mitlof] was relying on the 'skill or judgment.' " (NM Mem. Supp. Summ. J. at 10 (emphasis in original).)

The U.C.C. provides that

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose.

CONN. GEN. STAT. ANN. § 42a–2–315. The Official Comment to this section explains how to evaluate the circumstances surrounding a sale:

10. Our analogy to marine insurance disclosure requirements is supported by the Official Comment to this section of the U.C.C., which states that "[e]ven as to false statements of value . . . the possibility is left open that a remedy may be provided by the law relating to fraud or misrepresentation." CONN. GEN. STAT. ANN. § 42a–2–313, cmt. 8 (1990).

Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

CONN. GEN. STAT. ANN. § 42a–2–315, cmt. 1 (1990). Norwalk Maritime's argument is therefore misplaced, for it did not need to "know" that Mitlof was relying on its expertise to have breached this warranty.

Here, there is sufficient evidence showing that Norwalk Maritime knew both how Mitlof intended to use *Conservator* and that he relied on Norwalk Maritime's implied representation of the boat's suitability for such use. Mitlof's June 2, 1998 note to Schneider specifically states that if a "hull [inspection is] needed, I would prefer it be done at your facility since I plan on splashing the boat and taking it over by water route. This would avoid hauling again." (*See* Mitlof Mem. Opp. Summ. J., Ex. 17; Pls. Mem. Opp. Summ. J., Ex. E.) Moreover, on April 20, 1998, Mitlof sent Schneider a note whose attached letter—addressed to Mitlof—is from a "Jawonio, Inc.," located in New City, New York, which references Mitlof's contemplated "Rivertaxi" tours. (*See* Mitlof Mem. Opp. Summ. J., Ex. 21B.) Based on these documents, Norwalk Maritime was on notice that Mitlof intended to use *Conservator* for river tours that would likely occur on the Hudson River, given Mitlof's residence and the New City, New York location of Jawonio, Inc.

Furthermore, Mitlof's direct request about a hull inspection, along with Mike Pinto's handwritten note to Schneider reminding him to "[c]heck with USCG to see if they require hull inspection when vessel ownership changes" (*see id.,* Ex. 17; Pls. Mem. Opp. Summ. J., Ex. E), shows that Norwalk Maritime knew Mitlof relied on the past inspections of the boat in gauging its seaworthiness. Moreover, Norwalk Maritime admits as much in its brief, stating that "[Mitlof] improperly relied on [NM's] prior COI of the vessel." (NM Reply to Mitlof Mem. Opp. Summ. J. at 2.) Through the evidence submitted, Mitlof has created a genuine issue of material fact, and we must therefore deny Norwalk Maritime's motion for summary judgment as to the claim for breach of an implied warranty of fitness for a particular purpose.

## VI. *Negligent Failure to Inform USCG of Sale and Transfer of Boat*

■ Mitlof lastly alleges that Norwalk Maritime violated 46 C.F.R. § 176.120 by "fail[ing] to notify the [USCG], in a timely manner, of the sale and transfer of the M.V. Conservator." (3d-Party Complt. ¶ 13.) Norwalk Maritime contends that the regulation imposes such a duty—via requesting an amended COI—only upon a "change in the character [of] a vessel or in its route, equipment, ownership, operation, or similar factors specified in its current [COI]" (NM Mem. Supp. Summ. J. at 4 (citing 46 C.F.R. § 176.120(b))), and thus on a vessel's new owner.

Although the regulation does not specify which owner has to request the amended COI, we construed it as imposing the duty on the new owner in *Smith I. See* 130 F.Supp.2d at 581. Moreover, Mitlof argued in *Smith I* that the 1997 COI was still valid at the time of *Conservator's* capsizing, and that " '[t]here is no automatic

'revocation' or 'deactivation' upon sale of a currently certified vessel.'" *Id.* (citation omitted). Furthermore, the evidence Mitlof presents on the instant motion supports our interpretation of the regulation and defeats his own argument. He submits an e-mail and letter of Frank P. Hawthorne, a retired USCG Lieutenant, who interpreted the regulations for Mitlof and concluded that "[o]nce again, the CFR's, Sub T, puts the responsibility onto the *new* owner to make the contacts with the [USCG] and ensure that it is properly inspected before operation." (Mitlof Mem. Opp. Summ. J., Ex. 9 (emphasis added).)

Mitlof has argued inconsistently and supplied self-defeating evidence on this point. Therefore, we grant Norwalk Maritime's motion for summary judgment and dismiss the negligent failure to timely inform the USCG of *Conservator*'s sale and transfer claim.

## CONCLUSION

For the foregoing reasons, third-party defendant Norwalk Maritime's motion for summary judgment is granted as to the claim for negligent failure to inform the USCG of *Conservator*'s sale and transfer, and denied as to the claims for fraudulent misrepresentation, breach of express warranty and breach of implied warranty of fitness for a particular purpose.

SO ORDERED.